**MESSLER v. KNAPP BROS., Inc., et al.**
**Civil Action No. 1156.**

District Court, D. Massachusetts.
June 3, 1942.

Herbert B. Ehrmann, of Boston, Mass., for plaintiff.

Herbert P. Kenway, Kenway & Witter, Charles O. Pengra, Joseph Wentworth, and Choate, Hall & Stewart, all of Boston, Mass., for defendants.

WYZANSKI, District Judge.

### Findings of Fact.

1. Madge Messler, the plaintiff, is a citizen of Connecticut.

2. Matie C. Messler is an employee of Madge Messler and is or has been an employee of various corporations engaged in selling shoes of which Madge Messler is or has been the principal stockholder.

3. Knapp Brothers, Inc., one of the defendants, is a Massachusetts corporation that has for many years been engaged in the sale of shoes. Knapp Brothers Shoe Manufacturing Company, the other defendant, is a Massachusetts corporation that has been engaged since 1939 in the manufacture of shoes.

4. Clarence E. Knapp is and at all material times has been president and director of Knapp Brothers, Inc. He is and since 1939 has been vice president and director of Knapp Brothers Shoe Manufacturing Company.

5. Mert Hayward is and at all material times has been supervisor of shoe construction for the two companies.

6. May 26, 1931, the United States Patent Office issued to the plaintiff as assignee of Matie C. Messler Letters Patent No. 1,807,341. The plaintiff has been since that date and now is the owner of all rights under that patent.

7. Upon application filed August 25, 1931, the United States Patent Office on October 27, 1931, issued to the plaintiff as assignee of Matie C. Messler Reissue No. 18,237, being a reissue of Patent No. 1,-807,341 and including the claims there made and additional claims. The plaintiff has been since that date and now is the owner of all rights under that patent, with the exception of certain licenses granted to others, none of which licenses restrict the plaintiff from granting further licenses.

8. Reissue Patent No. 18,237 claims as an invention a cushioning insole for boots and soles which can be built in as part of the shoe or which may be inserted therein. The invention has for its object to provide a novel insole, which can be used in shoes of ordinary or standard makes as a cushion for the foot for its entire length and as a support for the arches of the foot, particularly for the metatarsal arch.

9. Claims 2, 3 and 4 of Reissue Patent No. 18,237 are as follows:

"2. A cushioning insole of soft rubber for boots and shoes provided with heel and shank portions of substantial and uniform thickness and a ball portion having a part thereof intermediate the side edges of the ball portion of substantially the same thickness as the shank and heel portions and having thinner side portions tapering downward laterally away from said intermediate part and extended rearwardly of a plane transversely of the insole through said intermediate part of said ball portion, said heel, shank and intermediate ball portions having normally substantially flat upper and lower surfaces, and being of substantially (sic) and uniform thickness to enable the heel portion to be substantially depressed by the heel of the foot to cushion the said heel, said shank portion conforming to and supporting the longitudinal arch of the foot, when said heel portion is depressed.

"3. A cushioning insole of soft rubber for boots and shoes provided with heel and shank portion of substantial and uniform thickness and a ball portion having a part thereof intermediate the side edges of the ball portion of substantially the same thickness as said shank and heel portions and having thinner side portions tapering downward laterally away from said

intermediate part and extended rearwardly of a plane transversely of the insole through said intermediate part of said ball portion and having a downward tapering part extended forward from the foremost end of the thicker intermediate part of said ball portion, said heel, shank and intermediate ball portions having substantially flat upper and lower surfaces, and being of substantial and uniform thickness to enable the heel portion to be substantially depressed by the heel of the foot to cushion said heel, said shank portion conforming to and supporting the longitudinal arch of the foot, when said heel portion is depressed.

"4. A cushioning insole of soft and compressible rubber for boots and shoes provided with heel and shank portions of substantial and uniform thickness and a ball portion having a part thereof of substantially the same thickness as the shank and heel portions, said insole tapering from the intermediate part of the ball portion to reduced edges, said heel and shank portions and a part of the ball portion normally having substantially flat upper and lower surfaces, and being of substantial and uniform thickness to enable the heel portion to be substantially depressed by the heel of the foot to cushion the said heel, said shank portion conforming to and supporting the longitudinal arch of the foot, when the heel portion is depressed."

10. Shoes with innersoles made according to these claims rely upon the basic fact that the human foot in functioning carries the weight of the body on three points of suspension; the weight strikes first on the heel, then on the ball of the little toes, and finally on the ball of the great toe, thus enabling the toes to grip the ground and lift the weight forward. With innersoles conforming to the claims of Reissue Patent No. 18,237, as the wearer places his weight on the heel which is of rubber, compression forces the resilient innersole up under the longitudinal and metatarsal arches of the foot, thus conforming to them and giving them support; and as the wearer carries his weight forward from the heel to the toes, the resilient innersole is pushed back under the arches.

11. October 20, 1925, the United States Patent Office issued Letters Patent No. 1,557,947 to Benjamin Stewart for an arch support and heel cushion pursuant to his application filed January 29, 1924. One of the objects of Stewart's invention was "to provide a new and novel arch support and heel cushion of simple, durable and inexpensive construction of the pneumatic type" (p. 1 lines 8–11). His "arch support and heel cushion comprises an elongated resilient container" (lines 51, 52). "The air container * * * may be of rubber or other suitable material and is preferably of substantially the same width from end to end" (lines 59–62). The container "is rounded at its rearward end to fit and cover the shoe heel and is preferably rounded at its forward end" (lines 92–95). As appears from the sectional view of Fig. 2, the container tapers forwardly; and, as appears from Figs. 1 and 3, the container at the ball portion also tapers laterally.

12. Although the taper in the Stewart claims is not so sharp as in the claims of Reissue Patent No. 18,237, I find that the Stewart innersole tapers so that it, like Messler's innersole, is shorter under the first and fifth metatarsals and supports the second, third and fourth metatarsals. I also find that as the wearer of the Stewart innersole places his weight on the heel of the pneumatic cushion, compression forces the innersole up under the longitudinal and metatarsal arches of the foot, thus conforming to them and giving them support; and as the wearer carries his weight forward from the heel to the toes, the pneumatic cushion is pushed back under the arches.

13. June 17, 1896, John Drewett applied for British Patent No. 13,327 which was accepted January 9, 1897. Drewett declared that his invention relates to improvements in socks to be worn inside boots and shoes. A sock is a term used in Great Britain to describe an innersole. According to Drewett's description of his invention the socks can be made of cork, hair, felting, leather or other materials in the form described in an accompanying drawing. Drewett claimed that "By raising the hind part of the foot the socks cause the foot to be drawn back slightly from the front of the boot or shoe and give more liberty to the toe joints and by taking the weight of the body and pressure from the toe joints confer a great advantage upon persons who have flat feet or who suffer from corns and hoofs underneath at the top of or between the toes. The sock is half an inch thick from the heel to the ball of the foot and tapers down from thence to one-eighth of an inch to the end of the toes."

14. Prior to 1932 Knapp Brothers, Inc., sold only hard bottom shoes. In that year it secured a license from Gray to use his patent. Thereafter the company sold shoes, called "Air-Tred", with a sponge filler between the outersole and the innersole. It is not claimed that the Air-Tred Shoes infringed Reissue No. 18,237.

15. During 1932, Clarence Knapp first saw the Messler type shoe—that is, a shoe manufactured in accordance with Reissue No. 18,237 and sold through companies owned by the plaintiff and employing Matie C. Messler. Knapp saw this type shoe when it was erroneously delivered to his company for exchange. He subsequently saw the same type on the feet of customers.

16. During 1935 Knapp in collaboration with Hayward began to experiment with new types of sponge rubber cushions. I find that in these experiments Knapp had in mind various types of shoes which he had seen including the Messler type shoe and also the Mason Shoe Company's Velvet-Eez shoe, which had a sheet of sponge rubber running the full length and width of the foot and having the shape of the sole of the foot.

17. In December 1935 Knapp had not had any contact with Matie C. Messler and had not learned of her ideas from Hayward, the salesman Barker or any source other than the shoes marketed by the plaintiff's companies. But at that time he had formulated his ideas for a new innersole sufficiently to discuss them with the New York salesmen of his company.

18. May 21, 1936, Knapp took the completed construction of his proposed innersole to a patent attorney who on July 11, 1936, on his behalf made application to the United States Patent Office for a patent embodying Knapp's alleged invention.

19. In June 1936, Knapp first met Mrs. Messler. She sought him out then and on every subsequent occasion when they met, except that on September 15, 1936 she came in response to a letter from Knapp referred to in Finding 24. All the meetings were at her solicitation and occurred at his place of business.

20. Mrs. Messler's objective in coming to Knapp was to induce him either to arrange for the manufacture of her shoes or to market her shoes on a royalty basis. She did not come to him to seek his comments on her shoes or to improve their design.

21. At their first meeting in June 1936 Knapp told Mrs. Messler he knew of her shoe, and he told her what he thought were its good features and what its bad features, particularly that the lining of the cushion wrinkled badly. At that time she proposed that his company should sell her shoes at a royalty of twenty-five cents per pair.

22. About a week later Mrs. Messler returned. Knapp again discussed her shoes; said they did not give positive support to the arch and should be reconstructed to give such support and to take out bulkiness from the cushion. He proposed that she should combine ideas with him and that on that basis his company might pay her a royalty of five cents a pair. Mrs. Messler insisted on ten cents. Then Knapp suggested that his company would agree to improve Mrs. Messler's construction, to arrange for the manufacture of the improved shoe, to keep in stock the Messler type shoe, and to allow Mrs. Messler when she had customers to draw from stock at cost plus ten per cent. Mrs. Messler asked to have the suggestion in writing.

23. Mrs. Messler came to Knapp a third time and he gave her the draft of an agreement embodying his suggestions that Knapp Brothers, Inc., arrange for the manufacture of, and keep in stock, the Messler shoe. He told her that if a contract were to be made, it should be made promptly. Mrs. Messler never accepted the offer, and no contract was made.

24. Mrs. Messler next saw Knapp in August. He told her that he was then starting to make, but had not fully manufactured, shoes according to the ideas he had before he saw Mrs. Messler. In September Mrs. Messler came back and saw some of the shoes. However, she particularly wanted to obtain a kidskin blucher which was not ready. When it was ready on September 15 Knapp wrote Mrs. Messler and she came in and secured some shoes. Later she came in for price lists.

25. In so far as it is a question of fact, I find that at no time were the relations of Mrs. Messler and Knapp upon a confidential basis. Her interest in seeking a business arrangement with the Knapps may have led her to describe her product fully, but not in confidence.

26. Neither in these conversations nor at any other time did Mrs. Messler teach Knapp anything regarding coverings for

sponge rubber. He knew about coverings and the method of affixing them before he met her, and indeed he, at their earliest conversation, criticised the wrinkled appearance of the Messler kid covering and suggested that the cover should be calf rather than kid. Moreover, his company never used kid coverings for the innersole.

27. At no time did Mrs. Messler teach Knapp anything regarding methods of selling shoes. He was the author of a book known as "The Direct Selling Manual", and Mrs. Messler has admitted that Knapp knew more than she did about shoes.

28. Mrs. Messler did inform Knapp that she was using for rubber for her cushion a particular grade, grade No. 44, made by Faultless Rubber Company of Ashland, Ohio. Thereafter Knapp sometimes purchased for his cushion that same type of rubber. He made his purchases from Faultless on occasion but more frequently from the Davidson Rubber Company and other companies. The rubber was listed in the Faultless catalog and was readily duplicated. Also it could have been duplicated after mere observation of the Messler innersole. In so far as it is a question of fact, I find that the use of this particular type of rubber for the purpose of making innersoles was not a matter of such special nature as to constitute a trade secret of Mrs. Messler.

29. Prior to 1936 it was common practice for companies engaged in direct selling of shoes to use advertising literature with illustrations showing fingers pressing down on the innersole. In so far as it is a question of fact, I find that the plaintiff's use of similar literature is not a trade secret.

30. Mrs. Messler described her cushion as making the wearer "walk on a soft, yielding, resilient cushion that massages and exercises the feet with every step". Knapp Brothers, Inc., in their 1940 catalog stated that "in Aerotred shoes you will walk on a soft, yielding, resilient cushion that massages and exercises the feet with every step." I find that the defendant borrowed that language and description from the plaintiff. In so far as it is a question of fact, I find that the language and descriptions are not trade secrets.

### Conclusions of Law.

1. In construing the claims of the plaintiff's patent, I conclude as a matter of law that the claims must be interpreted as calling for a heel, a shank and an intermediate portion of the ball all of the same thickness. Claim 2 lines 98, 99, Claim 3 lines 118, 119 and Claim 4 lines 9, 10 all teach that the ball portion is "of substantially the same thickness as the shank and heel portions". This language taken together with the statement that the heel and shank are of "substantial and uniform thickness" is free from any ambiguity. It entirely precludes the plaintiff's contention that so long as the heel is uniform throughout, it need not be uniform with the shank or the intermediate portion of the ball.

2. In view of the conclusion just stated, I conclude that the only correct interpretation of Claim 2 is this: The insole is of soft rubber; the heel is of substantial thickness; the shank is of the same substantial thickness; the intermediate part of the ball is of the same substantial thickness; the ball has thinner side portions tapering downward laterally away from the intermediate part and extending rearwardly of a plane transversely of the insole through the intermediate part; the heel has a flat upper and lower surface; the shank has a flat upper and lower surface; the intermediate part of the ball has a flat upper and lower surface; and when the heel is depressed, the shank conforms to and supports the longitudinal arch of the foot. I conclude that the only correct interpretation of Claim 3 is to add to Claim 2 the statement that the intermediate part of the ball (in addition to the lateral taper) has a downward tapering part extended forward from the foremost end of the thicker intermediate part of the ball. And I conclude that the only correct interpretation of Claim 4 is to add to Claim 3 the statement that the rubber must be compressible as well as soft. The statement in Claim 4 that the insole tapers from the intermediate part of the ball portion to reduced edges is merely another way of stating that the tapering is both lateral and forward.

3. I conclude that the Stewart patent anticipates Claims 2, 3 and 4 of the Messler reissue patent. Like Messler, Stewart shows a cushioning insole of soft rubber; the heel is of substantial thickness; the shank is of the same substantial thickness; the intermediate part of the ball is of the same substantial thickness; the ball tapers forwardly and laterally; and the heel, the shank and the in-

termediate part of the ball have flat upper and lower surfaces. Moreover, in Stewart's invention when the heel is depressed, the shank would conform to and support the longitudinal arch of the foot. The mere fact that the Stewart invention was of a pneumatic rubber cushion, rather than one of solid rubber, does not prove lack of anticipation, for the principle is identical, and the use of rubber innersoles was well known.

4. I conclude that the Drewett patent anticipates Claims 2, 3 and 4 of the Messler reissue patent. Like Messler, Drewett shows a cushioning insole which may be (though it need not be) made of soft, compressible rubber; the heel is of substantial thickness; the shank is of the same substantial thickness; the intermediate part of the ball is of the same substantial thickness; the ball tapers forwardly (though not laterally); and the heel, the shank and the intermediate part of the ball have flat upper and lower surfaces. The fact that Drewett did not specifically name rubber as the material to be used and the fact that he does not show a lateral taper from the intermediate part of the ball do not prove lack of anticipation.

5. Claims 2, 3 and 4 of Letters Patent Reissue No. 18,237 are invalid on the ground they were anticipated by Stewart in Letters Patent No. 1,557,947.

6. Claims 2, 3 and 4 of Letters Patent Reissue No. 18,237 are invalid on the ground they were anticipated by Drewett in British Patent No. 13,327.

7. Claims 2, 3 and 4 of Letters Patent Reissue No. 18,237 are invalid for lack of invention.

8. The plaintiff is not entitled to recover on Count 1 of the complaint.

9. There was no trade secret in the type of covering which the plaintiff or Matie C. Messler used for the rubber innersoles manufactured by them, or the method either of them used for affixing coverings to innersoles, or the advertising either of them used to promote sales of innersoles, or the descriptions either of them used to describe the Messler shoes, or the knowledge of the particular type of sponge rubber used by the plaintiff or Matie C. Messler.

10. Neither the plaintiff nor Matie C. Messler disclosed to the defendants any methods of manufacture, or commercial marketing arrangements, or hygenic and orthopedic properties of the plaintiff's product, or formula, or pattern, or device or information which constituted a trade secret.

11. In her discussions with Knapp and Hayward, Matie C. Messler made disclosures, if any, solely for the purpose of inducing the defendant Knapp Brothers, Inc., either to manufacture shoes for her or to market on a royalty basis the type of shoe covered by her patent. She did not seek either an appraisal or an improvement of the processes used by her or the plaintiff. Neither defendant was in such a confidential relationship to either the plaintiff or Matie C. Messler as to owe a duty not to disclose or utilize information revealed by the plaintiff or Matie C. Messler.

12. The plaintiff is not entitled to recover on either Count 2 or Count 3 of the complaint.

*Judgment for the defendants.*