SPACE AERO PRODUCTS COMPANY, INC., ET AL. *v.*
R. E. DARLING COMPANY, INC.

[No. 191, September Term, 1964.]

94

*Decided March 12, 1965.*

*Motion for modification of opinion and for rehearing filed April 7, 1965, rehearing denied and per curiam opinion on motion for modification filed April 12, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and OPPENHEIMER, JJ.

*Joseph Sherbow,* with whom were *Edward F. Shea, Jr.,* and *Rourke J. Sheehan,* on the brief, for appellants.

*William H. Pattison, Jr.,* with whom were *Simpson & Simpson* and *Joseph B. Simpson, Jr.,* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

This case involves the question of whether the court below properly enjoined the defendants from using what the appellee claims to be its trade secret in the building of oxygen breathing hoses. It also involves the scope of the injunction granted and other issues in connection with the conduct of the parties and rulings of the trial judge.

The appellee, R. E. Darling Co., Inc. (Darling) was founded as an individual business by Mr. Darling in 1948 and began the business of manufacturing oxygen breathing hoses for aircraft personnel, in Bethesda, Maryland. In 1950, Mr. Darling

undertook a research and development program in the course of which small-bore miniaturized, silicone flexible breathing hoses were produced; these hoses were sold to the Douglas Aircraft Company and to the Navy, beginning in 1953; the hoses were the same general type that are now qualified and referred to in certain military specifications. The business was subsequently incorporated. Four of the defendants below, Joseph A. Jackson; Eugene E. Fasano; Douglas L. Creger and William Phillips [1] (sometimes collectively referred to as the former employees) worked for Darling in various capacities. Each of them had been with Darling for some years; there was no formal contract of employment; each could be discharged by Darling at any time and had the right to leave at any time.

In the fall of 1960, these men decided to go into business in competition with Darling. They sought and obtained financial backing from the appellants, Norris Manufacturing Company (Norris) and William Brandenburg (Brandenburg), the president of Norris. Norris had supplied silicone products to Darling, but in 1959, the officers of Darling had formed the Materials Testing Company to make silicone compound and tubing. In late 1959 or early 1960, the United States Navy had sent a representative to Darling to discuss new proposed specifications for oxygen breathing hoses of certain types of which Darling had been the sole manufacturer and supplier. Thereafter, Military Specification H-22489 was prepared and issued in April, 1960. Darling began the study and work to qualify hose under the new specifications. On December 14, 1960, the appellant, Space Aero Products Co., Inc. (Space Aero) was incorporated by the former employees, who had resigned from Darling's employ between December 9 and December 23, 1960. Space Aero commenced business operations in Hyattsville, Maryland, in January, 1961. The first hose built by it was the same as the Darling hose and was built by some of the same people who had built the hose for Darling. Space Aero qualified

---

1. Phillips did not appeal from the orders of the lower court. At the trial, he testified for Darling. Phillips had left the employment of Space Aero Products Co., Inc. but was still one of its stockholders.

its hose under Military Specification H-22489 in the middle of January, 1961; it was submitted to the Navy on February 20, 1961. Darling did not submit any hoses for qualification under this specification until April 25, 1961. The Navy accepted Space Aero's hose in May, 1961.

Darling filed its suit on February 27, 1961. The appellants filed answers denying that the appellee had a cause of action against any of them. No preliminary injunction was issued. After the protracted taking of testimony,[2] Judge Pugh filed an opinion on May 27, 1964 in which, after reviewing what he regarded as the salient features of the testimony, he found from the evidence that the former employees "learned the know-how to set up a competing business which knowledge was gained by them while in the employ of the plaintiff." He further found that the former employees owed the duty of fidelity and trust to their employer while they were employed and had breached that duty. He found further: "that other hose manufacturers in this Country have endeavored to produce an oxygen breathing hose which would compete successfully with the plaintiff's but had failed to do so despite their knowledge and experience but the defendants were able to do so immediately and within twenty days after the charter was granted to its corporation, all because of the knowledge they had gained during their employment by the plaintiff." Brandenburg and Norris, the court found, had illegally entered into a conspiracy to cause the former employees to cease working for Darling. Other findings of the lower court will be referred to in the discussion which follows.

On June 10, 1964, the lower court entered an order which permanently enjoins and restrains the appellants "from further manufacture and/or sale" of oxygen breathing hoses "of like or similar construction to hose assemblies manufactured to the requirements of United States Military Specification Mil H-22489." The court further ordered the appellants: "to immediately deliver up to this Court for destruction any and all drawings, manuals, documents and other materials in their posses-

---

2. The trial, held largely *in camera*, took 38 trial days. The exhibits of both sides exceeded 150. The record abstract before this Court consists of over 2000 printed pages.

sion which describe or disclose the equipment, components, methods or techniques utilized in the manufacture of those hose assemblies." The defendants were ordered to pay the costs, and the court retained jurisdiction for the purposes of determining Darling's rights to an accounting and for damages.

On June 10, 1964, the date of the injunction, the United States filed a statement as *amicus curiae,* in which it requested the court to consider the interest of the United States in the scope of the injunction to be entered, as set forth in the affidavit of Rear Admiral W. T. Hines, attached to and made a part of the statement. This affidavit states, in part: "[I]t affirmatively appears that the National Defense interest would be adversely affected in the delay resulting from any inability of Space Aero Products, Co., Inc. to deliver vitally needed products under Contracts N383-85726A, N383-86598A, and ASO-82299A." The United States asked that an injunction in the case should exclude the performance of the contracts referred to in Rear Admiral Hines' affidavit. On June 17, the appellants filed a petition for modification of the injunction, to which the appellee filed an answer. On June 30, the court below, without a hearing, signed an order denying the petition for modification.

The appellants appealed both the orders of June 10 and June 30, 1964. After the appeals, through proceedings in this Court and the lower court, the injunction was stayed upon the giving of a bond for damages.

The appellants contend that the evidence did not support a finding that the former employees violated their duty of loyalty and trust in setting up a company to go into competition with Darling; that the evidence did not support findings that the appellee did in fact possess trade secrets or knowledge proprietary to it and that the appellants wrongfully misappropriated such trade secrets or proprietary knowledge; that the broad scope of the injunction was improper; that the evidence required a finding that Darling had "unclean hands" and should therefore be denied the aid of an equity court; and that the lower court committed reversible error in several of its rulings. We shall consider these contentions in a somewhat different order.

### The Existence of a Trade Secret

A trade secret is described in *Restatement, Torts,* § 757, comment *b,* as follows:

> "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers."

In an excellent treatise by Turner on *The Law of Trade Secrets* (London 1962), which considers the American as well as the English cases on the subject, the learned author states:

> "The subject-matter *capable* of protection may be an industrial secret like a secret machine, process, or formula, or it may be industrial know-how (an increasingly important ancillary of patented inventions); it may be information of any sort; it may be an idea of a scientific nature, or of a literary nature (such as the plot of a story or the theme of a television series), or it may be a slogan or suggestion for a method of advertising; lastly, the subject-matter may be the product of work, or expenditure of money, or of trial and error, or the expenditure of time. Secrecy is not *necessarily* a constituent of a protectable subject-matter, but when it is, different degrees of imperfect secrecy are sufficient in different circumstances to make subject-matter capable of protection." p. 4.

Whether or not there is a trade secret and, if there is, whether its owner will be protected against persons accused of using it unlawfully, has been considered in numerous cases in federal and state jurisdictions, and in England, as well as by text writers. See *inter alia* the cases cited in *Mycalex Corporation of America v. Pemco Corporation,* 159 F. 2d 907, 913 (4th Cir. 1947). The legal principles are not in dispute; it is their ap-

plication to the particular facts on which, in general, the decisions turn.

As has been done in other cases, we shall summarize what we regard as the salient facts but will not set them out in such detail as to disclose the alleged trade secret, which it is the purpose of this litigation to protect. *Head Ski Company v. Kam Ski Company,* 158 F. Supp. 919 (D. C. Md. 1958). See also annotation, *In Camera Trial of Hearing and Other Procedures to Safeguard Trade Secret or the Like Against Undue Disclosure in Course of Civil Action Involving such Secret,* 62 A.L.R.2d 509, 530-532, and cases therein cited. In reviewing the testimony, it is to be remembered that Maryland Rule 886 a provides that, when an action has been tried by the lower court without a jury, the judgment of the lower court will not be set aside on the evidence unless clearly erroneous. *Wood v. Wood,* 227 Md. 211, 176 A. 2d 229 (1961). If there is substantial evidence to support the lower court's factual conclusion, that finding must be reviewed in the light most favorable to the prevailing party below. *Goodwin v. Lumbermens Mut. Cas. Co.,* 199 Md. 121, 128, 85 A. 2d 759 (1952). The conclusions of law based upon the facts, however, are reviewable by this Court. *Tyler v. Secretary of State,* 230 Md. 18, 20, 185 A. 2d 385 (1962). See *Moran v. Moran,* 219 Md. 399, 401, 149 A. 2d 399 (1959).

There was substantial testimony on behalf of Darling that its manufacture of the hoses involved approximately thirty different steps. Admittedly, some of these steps consisted of simple manual operations and the use of devices and uncomplicated machinery which in themselves were known to the industry. It is not any one of the steps but their selection, order and conjunction which Darling contends is its trade secret. In general, and without going into the details of the testimony, it is the application of the silicone rubber to produce the desired result which Darling claims is its own unique secret, based on research and experimentation and embodying the result of years of trial and error before the requisite "know-how" was achieved. It is the requisite strength and delicacy of the oxygen breathing hose for pilots which necessitates the numerous methods and techniques which Darling has used.

The court below referred to Darling's "know-how." A knowledge of the particular process, method, or material which is most appropriate to achieve the desired result may itself be a trade secret. *Head Ski Company v. Kam Ski Company, supra,* 158 F. Supp. at 923; *Manos v. Melton,* 358 Mich. 500, 100 N. W. 2d 235 (1960); *By-Buk Company v. Printed Cellophane Tape Company,* 163 Cal. App. 2d 157, 329 P. 2d 147 (1958); cf. *Mycalex Corporation of America v. Pemco Corporation,* 64 F. Supp. 420 (D. C. Md. 1946) affirmed 159 F. 2d 907. See Turner, *op.cit.,* at 35-37.

One of Darling's witnesses, Rothermel, a chemical engineer experienced in the manufacture of flexible hose, had been employed by the Dayton Rubber Company from 1936 until 1960. He became a technical superintendent of one of the plants of the Dayton Rubber Company (now the Dayco Corporation); later he became Vice-President and General Manager of Strato Safety, a wholly owned subsidiary of Dayton Rubber Company in California. From September 1, 1958 until February 1, 1960, his one assignment was to produce hose that was equivalent or equal to Darling's hose, which would be accepted by the customers on an equal basis. Rothermel was directed by the president of the Dayton Rubber Company; he had the full facilities of the laboratory and the knowledge of the suppliers of that company and could draw on all of its equipment. To the best of Rothermel's knowledge, Darling was the sole manufacturer of the hose here in question in 1956 and thereafter; hose of that type, as far as he knew, was not built by anyone other than Darling. He had hoses manufactured by Darling but, in his opinion, it was not possible to produce the hose by just having a sample of it, except, perhaps, after several years of trial and error. He did not have Military Specification H-22489 at the time he was working to reproduce the Darling hose, although he had the specifications within the three months prior to trial, but, in his opinion, he could not have produced the hose even if he had had the specifications. There was other testimony to the effect that these specifications only gave the details of the particular results which were required in the oxygen breathing hose and did not explain how those results were to be obtained. Rothermel testified further that he had difficulty

in finding proper silicone rubber compound, in putting in communication wires and other matters necessary for the proper manufacture of the desired product.

Opper, a witness called for the defendants, was employed by the Dayco Corporation since 1950; from 1959 he has been manager for the Strato Safety Equipment Division; he worked for several years on oxygen breathing hose and obtained a contract from the Navy for the building of small-bore hose from the Military Specification H-22489 on June 7, 1961, although the company did not qualify until April of 1963. The hoses produced under Opper's direction had different dimensions from those made by Darling and Space Aero but the specifications under which the Strato Safety hose was manufactured were identical.

The appellants contend that Rothermel chose to duplicate the Darling hose unassisted and, as a result, the compound he used refused to stay in place. They produced experts of their own, including Muller, Director of Engineering of H. K. Porter Company, one of the largest industrial manufacturers in the country, who visited the Space Aero plant and testified that each of the elements he saw and the manner in which each step was being performed were substantially the same as one or another of the processes with which he had been familiar in the industry. The defendants also offered Professor Charles Alfred Shreeve, head of the mechanical engineering department of the University of Maryland, an expert in mechanical engineering. He testified to the same effect as Muller and stated further that the trade secrets he heard described by Mr. Darling on the stand were neither new, novel nor unknown but were all obvious mechanical processes. Darling contends that Muller was unable to recall or describe much of the equipment and many of the process steps utilized at Space Aero; and that Shreeve could not remember many steps and techniques used in the Space Aero process. None of the appellants' expert witnesses, other than Brandenburg, testified he could have reproduced the Darling hose without having seen it in actual manufacture.

Brandenburg, a research chemist and manufacturer of silicone products, testified he was thoroughly familiar with the Darling hose building process, which he had helped develop,

and that each of the steps was common knowledge in the industry. He admitted, however, that there were no other companies building the hose.

The finding of the court that other hose manufacturers in this country have endeavored to produce an oxygen breathing hose which would compete successfully with Darling's but (at least until 1963) have failed to do so, is clearly supported by the testimony.

The testimony as to whether Darling's methods and processes were unique, and, as a composite result, known only to it, or whether they were generally known and in the public domain, is voluminous and conflicting. The record, as a whole, convinces us that the trial judge was not in error in his implicit finding that Darling's "know-how" in the manufacture of its hoses was the subject matter of a trade secret.

This holding does not extend to the male disconnect, referred to at length in the evidence. This disconnect is attached to the hose, and is fitted to a female connector in the plane which leads to the oxygen supply. The testimony shows that the drawings of the male disconnect, bearing standard military specification numbers, were originally obtained from Douglas Aircraft Company, which had developed them, and then recopied under Darling's name. The disconnect could be ordered as a complete unit merely by using the military specification and order numbers. Several companies listed these numbers in published catalogues. The male disconnect shown in the drawings can be purchased on the open market. Darling shortened the part as shown in the drawings by half an inch, added some knurling and rounded the end of the insert portions. These changes are visible on inspection of the part. None of the elements of a trade secret is present in respect of the male disconnect, nor does the testimony support any design rights of Darling therein. A trade secret as to the manufacture of the hoses themselves can exist apart from the disconnect attached to them.

Even though a process or method may be the subject of a trade secret, a substantial element of secrecy must exist before the owner of the method is entitled to judicial protection. Absolute secrecy is not essential but a substantial element of se-

crecy must exist so that there would be difficulty in others properly acquiring the information. *Mycalex Corporation of America v. Pemco Corporation,* 64 F. Supp. 420, 423 (D. C. Md. 1946); *Excelsior Steel Furnace Co. v. Williamson Heater Co.,* 269 Fed. 614, 616 (6th Cir. 1920); Turner, *op. cit.,* 71-98; Callmann, *Unfair Competition and Trade-Marks,* § 53.3 (e); Ellis, *Trade Secrets,* §§ 26, 53. A trade secret owner, however, does not abandon his secret by a limited public publication for a restricted purpose. *Abernethy v. Hutchinson,* 1 H. & T. W. 28, 3 L.J. (o.s.) (Ch.) 209 (1824).

The *Restatement* sets forth some factors to be considered in determining whether given information is one's trade secret. These factors are: "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Restatement, Torts,* § 757 b.

The testimony was uncontradicted that the Darling process was the result of years of experimentation and research; approximately a quarter of a million dollars went into the development of the processes and methods. The value of the information gained in the development of the hoses to Darling is clear. From a small business in 1948, Darling has grown to a point where in excess of two hundred persons are employed and where it is manufacturing one hundred or more different types of hoses, with a gross of nearly five million dollars a year. The value which the information would have had to other companies, if they could have been successful in making a similar type of hose, is evident if only from the efforts of Dayco Corporation which tried for years to duplicate the Darling method and, despite its resources, was unsuccessful until 1963.

The Darling methods were known, and indeed had to be known, to some of its employees, including its former employees who formed Space Aero. The extent of measures taken by Darling to guard the secrecy of the information is in dispute. As

evidence of the requisite secrecy, Darling points to the testimony that, during the initial stages of the development of the hoses, the activities and process were kept secret even from Darling's employees. The Instruction Guide issued for training, offered in evidence, states that the methods and processes and the manner in which materials were used must be considered as trade secrets, and that to divulge this information to any individual outside of the company would provide others with knowledge and information detrimental to the existence of the company. A lock box was maintained in the plant for blueprints and a list of authorized personnel with keys was carefully maintained. The training of the company's employees was in a separate area and, according to Darling's witnesses, the trainees were frequently told that the company had processes of which no one else in the world knew.

The appellants' testimony presented a quite different picture. A former supervisor testified that she and other employees were never cautioned to hold the method of manufacture in confidence. The mutable Phillips testified that, while he knew there was no one else in the United States making hoses in a method similar to that of Darling, he did not recall being admonished not to discuss the product.

The Darling methods were also known to Brandenburg who, through Norris, was involved in Darling's business. Norris did not manufacture oxygen breathing tubes, but its sales of its silicone products to Darling increased from a volume of a few hundred dollars in 1953 or 1954 to about three hundred thousand dollars in 1960. During the years of the relationship, Brandenburg made many visits to the Darling plant, and testified that he was familiar with each step of the process of making the hoses and had been of material help in the entire development. On the latter point, however, there was conflicting testimony on behalf of Darling, to the effect that Brandenburg had only been consulted in the area of the compounds which he furnished. Judge Pugh, in his opinion, while making no express findings of fact, referred to the evidence that Brandenburg had full and complete knowledge of the operation of the Darling plant and that, independently of this knowledge, Brandenburg had the know-how to build the hose. Whether or not the

testimony would have justified a finding to this effect, the relationship of the parties is pertinent. Darling and Norris were working together, as manufacturer and supplier, in what was, to some extent at least, a joint enterprise. Brandenburg testified, in answer to a question by the court, that it was not the policy of his company to "go around telling other people what some one else is doing." "There was a certain amount of ethics involved." By Brandenburg's own testimony, there was some element of confidence and trust in the relationship. Under all the circumstances, Brandenburg's knowledge of the process, however complete, did not negate the substantial element of secrecy necessary to the existence of a trade secret. *Saco-Lowell Shops v. Reynolds,* 141 F. 2d 587 (4th Cir. 1944) ; *International Industries v. Warren Petroleum Corp.,* 99 F. Supp. 907 (D.C. Del. 1951). See *Chun King Sales v. Oriental Foods,* 136 F. Supp. 659, 662 (D.C. S.D. Cal. 1955). Cf. *Mycalex Corporation of America v. Pemco Corporation,* 159 F. 2d 907 (4th Cir. 1947) ; and *Messler v. Knapp Bros.,* 52 F. Supp. 812 (D.C. Mass. 1942).

There was much testimony as to tours through the plant and particularly as to a public demonstration of hose-building for the Greater Washington Industrial Council, during which small groups of guests were given demonstrations of hose-building and other techniques. The appellants point, *inter alia,* to the testimony that two overhead garage doors to the street were left open and that workers were free to have visitors while they were assembling the hose.

Darling's plant was located not in one of the country's great industrial centers, but in a relatively small, if growing community. The testimony, taken as a whole, convinces us that Darling took precautions to guard the secrecy of its process which, under the circumstances, were reasonably sufficient. In its particular community and environment, it may well be that Darling considered that too elaborate efforts at concealment would call attention to what was being concealed, as in Poe's "Purloined Letter." In any event, as the lower court emphasized in its opinion, no one else succeeded in making hoses according to the Darling process. Until the formation of Space Aero by Darling's former employees, Darling's efforts at secrecy, like the process itself, met the basic criterion of success.

Upon consideration of all the testimony in the light of the applicable legal principles, we are convinced that Darling's processes and methods in manufacturing its oxygen breathing hoses (apart from the male disconnect fitting) constituted a trade secret.

## The Liability of the Former Employees

The development of the law of trade secrets is a result of balancing two conflicting elements essential to our society. There is a strong policy favoring free competition; an employee is entitled to use the skill and knowledge of his trade or profession which he has learned in the course of his employment, for the benefit of himself and the public, if he does not violate a contractual or fiduciary obligation in doing so. *C-E-I-R, Inc. v. Computer Corporation,* 229 Md. 357, 366, 183 A. 2d 374 (1962); *Ritterpusch v. Lithographic Plate Service, Inc.,* 208 Md. 592, 595, 119 A. 2d 392 (1956); *Restatement, Torts,* §§ 708 and 757, comment *a; Herbert Morris Ltd. v. Saxelby,* 1 A.C. 688 (1916); *Sir W. C. Leng & Co. v. Andrews,* 1 Ch. 763-777 (1909). On the other hand, in order to promote the progress of science and the useful arts, the law provides certain protections to an originator. Among these protections are the patent and copyright statutes and the law of torts prohibiting unfair competition. The law protecting trade secrets is another protection.

The basis of the law as to trade secrets, apart from breach of contract, is abuse of confidence or impropriety in the means of procurement. Justice Holmes stated the legal principle in *Du Pont Powder Co. v. Masland,* 244 U. S. 100 (1917), as follows:

"The word property as applied to trade-marks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore the starting point for the present matter is

not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets he must take the burden with the good." 244 U. S. at 102.

The *Restatement* summarizes the doctrine enunciated in the case law as follows: "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * * (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." *Restatement, Torts,* § 757. See also *Carter Products, Inc. v. Colgate-Palmolive Co.,* 130 F. Supp. 557, 571-75 (D. C. Md. 1955).

Judge Pugh points out in his opinion that the uncontradicted evidence shows that each of the former employees was an employee of Darling from November 1, 1956 to the month of December, 1960, and that each of them had an important position with the plant in the building of oxygen breathing hoses. After setting forth the nature of their assignments, Judge Pugh states that "in their respective positions these defendants knew the hose business, each having learned all there was to know from the plaintiff." He then stated:

"While in the employ of the plaintiff, the defendants at the instigation of Jackson, discussed going into the hose business from September, 1960, to early in December, 1960, and such discussions led to the making of plans, financial and otherwise, to go in the business of manufacturing the same kind of oxygen breathing hoses manufactured by the plaintiff. The incentive to go in business was to submit bids to the United States Navy under its Military Specification H22489, which was open to the public in the month of April, 1960. All individual defendants knew of the existence of this Military Specification which came to the knowledge of

the individual defendants who were employees of the plaintiff by virtue of their employment with the plaintiff. * * * It was only twenty-nine (29) days after the charter was granted to the defendant corporation when it submitted a hose to the Navy on February 20, 1961. The rapidity with which this was done is only attributable to the fact that the individual defendants, except William Brandenburg and Norris Manufacturing Company, had gained the knowledge to set up a business and manufacture the hose under the military specifications, which came to their knowledge while they were employed by the plaintiff."

The processes used by Space Aero were the same as those used by Darling. While Darling did not qualify under the military specification until several months after Space Aero had submitted its hose to the Navy, Darling contends that information which would have accelerated Darling's qualification had been obtained by Jackson, one of the appellants, while still in Darling's employ, and was intentionally withheld and secreted by him. This claim is disputed by the appellants, but, in any event, the dispute on this issue goes to whether or not Darling is entitled to damages for loss on the Navy contracts by reason of the appellants' breach of their duty of fidelity, and not to whether that duty had been violated. The testimony amply supports the findings of fact of the court below.

While none of the former employees had signed a contract with Darling in which they formally agreed not to use the information acquired by them, and while they were free to leave their employment at will, Judge Pugh found that they owed the duty of fidelity to their employer while they were employed. We agree. *C-E-I-R, Inc. v. Computer Corporation, supra,* 229 Md. at 366; *Ritterpusch v. Lithographic Plate Service, Inc., supra,* 208 Md. at 602. That *C-E-I-R* and *Ritterpusch* involved the improper solicitation by employees of their employer's customers, rather than the improper use of the employer's trade secret, does not make the principle for which those cases stand less applicable. It is the breach of the confidential relationship rather than the form which that breach takes which is determinative.

Much of the testimony concerned the taking of various drawings and other material from Darling's plant by some of the former employees before they left the company's employ and the subsequent steps taken by Darling to endeavor to gain repossession of the drawings. The court below found as a fact that some of the former employees had in their possession, after leaving Darling's employment, certain sketches of oxygen breathing hoses which they had taken while they were employed by Darling, without Darling's knowledge. One of the former employees, Jackson, instructed his wife over the telephone, when he was in California after severing his connection with Darling, to burn the drawings in his possession in his home. Wilkinson, another former employee, burned some of the drawings which Jackson had given him. The court below also found that there were some of Darling's drawings on the drawing-board in the home of another of the former employees which were copies of Darling's drawings. Judge Pugh found that it was doubtful as to whether or not the drawings were in fact the drawings of Darling, but that the evidence clearly showed they were in fact Darling's property. During the argument of this appeal, counsel for the appellants admitted that the taking of these drawings was wrongful.[3] Judge Pugh also found that other records of Darling's, such as copies of its Security and Quality Control Manuals, were in possession of some of the former employees after they had severed their employment. The testimony strongly indicates that all the drawings to which reference has been made were in effect public property or were drawings or copies thereof sent to Darling by the Douglas Aircraft Company. The appellee does not contend it had trade secrets in these drawings. The testimony does not show, in our opinion, that these drawings were necessary for the production of the oxygen breathing hose by Space Aero and the individual appellants, or the securing of the Navy contracts. As Judge Pugh infers in his opinion, however, the actions of the former employees in respect of the drawings strengthens the conclusion

---

3. It was stated without contradiction that these acts by some of the former employees took place before they were represented by counsel.

that, in availing themselves of Darling's trade secret concerning the manufacture of the oxygen breathing hose, the former employees knew that they were acting wrongfully in violation of their confidential relationship and their duty of loyalty.

We agree with the court below that the former employees violated the duty of fidelity and trust which they owed to Darling in respect of the trade secret and that their conduct was such as to entitle Darling to the protection of a court of equity.

## The Liability of Brandenburg and Norris

The evidence is undisputed that Norris, through Brandenburg, its president, had conferred with the former employees before they left Darling's employment and that Brandenburg advanced $1000 towards the formation of the new enterprise, a few days before the lease for the Space Aero plant in Hyattsville was entered into. Additional advances or investments totalling $7000 were made in 1960, and still further advances were made in the first months of 1961 totalling in excess of $90,000. Norris now owns 49% of Space Aero's stock.

The judge below excepted Brandenburg and Norris from his finding that the defendants could not have gone into a competing business without the knowledge gained at Darling's plant. He found, however, that Brandenburg and Norris, through Brandenburg as its president and agent, illegally entered into a conspiracy to cause the former employees to terminate their employment with Darling.

The appellants contend that the former employees had decided to leave Darling whether or not Brandenburg and Norris gave them financial backing. They contend further that Brandenburg had independent knowledge in respect of the manufacture of the hose by the process used by Darling. It is undisputed that neither Brandenburg nor Norris was under any express contract with Darling in respect of the hose process. It is also undisputed that while Norris had been a large supplier of material to Darling, Norris and Brandenburg were apprehensive that the subsidiary being formed by Darling might take away much of Norris' sales to the parent company.

There is no question of the right of a supplier to a company to become interested in the formation of another company to

which he expects also to sell his supplies. Neither Norris nor Brandenburg was under an express contractual obligation to Darling in respect of the non-use of Darling's trade secret. We do not reach the question of whether Brandenburg and Norris were liable to Darling for the breach of an implied agreement.[4] We agree with the court below that by their actions in respect of the former employees and the formation of Space Aero as a competing company for the procurement of Navy contracts under the Military Specification H-22489 through the use of Darling's trade secret, Brandenburg and Norris became liable to Darling.

In *Conmar Products Corp. v. Universal Slide Fastener*, 172 F. 2d 150 (2d Cir. 1949), Chief Judge Learned Hand enunciated the principle which we believe is here applicable:

> "Courts have been accustomed to speak of trade secrets as 'property,' and at times to deal with them as if they were. That may be permissible and to some extent desirable, when the question is whether the wrongdoer has got access to them by some wrongful means, like breaking into a factory, or copying formulae or blue prints. When, however, the dispute turns, as it does here, upon whether the wrongdoer has acquired a secret from the employee who has himself acquired it lawfully, the wrong consists in inducing him to break his contract, or to be disloyal to a confidence reposed in him; and in either case it is a species of the tort— recognized now for over a century—of inducing an obligor to default upon an obligation." 172 F. 2d at 155.

See also *McKinzie v. Cline*, 197 Ore. 184, 252 P. 2d 564 (1953); *Restatement, Torts*, § 757, Comment on Clause (a) h.

The evidence amply sustains the finding of the court below that Brandenburg and Norris encouraged the former employees to do what they did do while they were still in Darling's employ. Even though Brandenburg and Norris may have had the knowledge and the ability to form a competing company on the

---

4. See cases cited at page 112 of this opinion.

basis of their own know-how and without the use in any way of any knowledge they may have acquired from their dealings with Darling, what they did was knowingly and for their own interests, to help the former employees in their illegal action. This was sufficient to make them liable to Darling. See *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 559-60, 69 Atl. 405 (1908) ; and *Restatement, Agency,* § 312 comment d.

## The Contention of "Unclean Hands"

The appellants contend that Darling acted improperly in procuring a search warrant and in having the police department of Montgomery County enter the home of Wilkinson, one of the former employees, and take from his home certain drawings, when no criminal charge had been filed against Wilkinson. They also contend that Darling improperly harrassed Brandenburg by having a number of detective agencies calling his family and business associates, and in other ways. They argue further that Darling acted improperly in sending over one hundred letters to various concerns asking if they were doing business with Space Aero. They object to meetings between officers of Darling and the defendant, Phillips, during the trial; and claim that Darling lacked the required candor before the lower court. Because of these actions, the appellants claim that Darling's suit should have been dismissed because it did not come into court with clean hands.

In the argument on this appeal, counsel for the appellants admitted that some of Darling's drawings were improperly taken by various of the former employees while they were still in Darling's employ. The question of whether or not the search of Wilkinson's house on the warrant obtained by Darling was legal or illegal does not go to any of the issues which, in our opinion, are determinative of this case. The various telephone calls and correspondence to which the appellants object were not on their face unreasonable in the protection of what we have found to be Darling's legal interest in its trade secret.

During the trial, Phillips, one of the defendants below who has not appealed, called Darling's counsel for the purpose of arranging a meeting with one of Darling's principals. The meeting took place without the presence of counsel for either side

and without the knowledge or consent of Phillips' counsel. According to Phillips, it was at this meeting that he turned over certain physical evidence to Darling and agreed to state the true facts when called as a witness. At the trial, Phillips gave testimony inconsistent with his pre-trial deposition and, with the court's consent, counsel struck their appearance for Phillips and proceeded to attempt to impeach his testimony. Irrespective of the impropriety of an attorney arranging a meeting between parties to pending litigation without notice to other counsel of record,[5] it was for the trial court, sitting without a jury, to determine for itself the credibility of Phillips' testimony on the witness stand, and, in so doing, to consider what had taken place before the testimony was given.

The clean hands doctrine is one resting in the sound discretion of the court; it is applied, not for the protection of the parties, but for the court's own protection. *Niner v. Hanson,* 217 Md. 298, 309, 142 A. 2d 798 (1958). *Thomas v. Klemm,* 185 Md. 136, 142, 43 A. 2d 193 (1945). The court below heard voluminous testimony as to all of the matters raised in connection with this issue and refused to bar Darling from the relief to which the court found it was entitled. We do not find that the court's refusal to apply the doctrine was an abuse of its discretion.

### Objections to Rulings of the Court

The appellants contend that three of Darling's exhibits were improperly admitted in the trial below over timely objection. These exhibits were drawings obtained by the Montgomery County police as a result of the search and seizure to which reference has been made. The court below granted the appellants' motion to exclude the drawings as to Wilkinson but de-

---

5. Witnesses do not belong to either side of the controversy; they can be interviewed by counsel for any party, in civil as well as in criminal cases. See *State v. Papa,* 32 R. I. 453, 80 Atl. 12, 15 (1911) and *Mathews v. State,* 44 So. 2d 664 (Sup. Ct. Fla. 1950). When a witness is also one of the parties, however, and is represented by counsel, a lawyer for the other side should not in any way communicate with him without the knowledge and consent of the party's own counsel. See Canon 9, *Canons of Professional Ethics of the American Bar Association* and Drinker, *Legal Ethics,* p. 201.

nied the motion as to the other appellants. We do not find it necessary to decide whether or not these exhibits were improperly admitted for, even if they were, any error in connection with their admission was not prejudicial. We have found that the drawings were not part of Darling's trade secret but they were Darling's property and several of the former employees admitted on the stand that the drawings had been taken before the employees had terminated their employment. The impropriety of the taking of the drawings was admitted by the appellants' counsel. Apart from the drawings themselves, the circumstances under which they were taken was admissible evidence which tended to show that the former employees meant to breach their confidential relationship and duty of loyalty in improperly using Darling's trade secret to compete with it. The court below found that the drawings were of use to the defendants in setting up their competitive business, but there was ample testimony other than the actual drawings which supported this finding. The introduction of the drawings themselves was only cumulative and unessential.

The appellants also contend that the lower court committed prejudicial error in refusing to have several of their expert witnesses present during the taking of testimony *in camera* unless they took an oath of secrecy as to all the matters testified to. Darling, at all times, claimed that its manufacturing process was a trade secret. The court stated that "by the very nature of the case secrecy is an essential factor." Maryland Rule 546 provides that the court may on its own motion exclude witnesses other than parties from the courtroom until called upon to testify, but excludes from the operation of the Rule an expert witness who is to render an opinion based on the testimony given at the trial. This Rule, however, is not a contravention of the general principle that in taking testimony on matters in which, by the nature of the case, such as the one here involved, secrecy is an essential factor, the trial court has discretion to permit expert witnesses to remain in the courtroom only under reasonable conditions imposed to maintain secrecy. Annot., *supra,* 62 A.L.R. 2d 509, at pages 513-525 and 527-529 and cases therein cited.

At the trial, the court suggested that the expert witnesses

take an oath of secrecy similar to the oath of secrecy the Grand Jury takes. One of the appellants' witnesses, Shreeve, took the oath and remained during the *in camera* proceedings. Other expert witnesses of the appellants, because of their positions, refused to take the oath. As to these witnesses, the appellants proceeded by asking them what they had seen at the Space Aero plant and whether those methods were generally known. It is true that, from the appellants' point of view, it would have been preferable if they could have had all of their experts present during the *in camera* proceedings; their witness, Shreeve, who took the oath of secrecy, was so present. The other witnesses, however, testified from their examination of the processes and methods used at the Space Aero plant that these methods and processes were virtually the same as those used by Darling. The fact that the appellants' expert witnesses, other than Shreeve, because of their employment, felt they could not take the oath of secrecy, is understandable but of itself did not give the appellants the right to have those witnesses present during the *in camera* proceedings without taking the oath. The trial court was of the opinion that to permit these witnesses to attend the *in camera* proceedings without taking the oath might seriously prejudice Darling's rights. For the same reason, the court refused to permit the appellants' counsel to review the *in camera* testimony with the experts who had been excluded. Under all the circumstances, we can not find that these rulings constituted an abuse of discretion.

## The Scope of the Injunction

The order of the lower court, filed June 10, 1964, permanently enjoins the former employees, Space Aero, Brandenburg and Norris from further manufacture or sale of high or low pressure hose assemblies utilized in oxygen, air and pressure suit systems of like or similar construction to hose assemblies manufactured to the requirements of United States Military Specification H-22489, and from advising any person, firm or corporation as to the means for or method of manufacture of such hose assemblies.

There is no provision in the order for the termination of the injunction if and when Darling's trade secret becomes generally

known to the public; nor is there any provision with reference to the interest claimed by the United States in the scope of the injunction.

Injunction is a proper equitable remedy to protect the interest of the proprietor of a trade secret against the wrongful use of that secret in breach of a fiduciary duty. *Franke v. Wiltschek,* 209 F. 2d 493 (2d Cir. 1953); *Restatement, Torts,* § 757 (e); Callmann, *op.cit.,* § 59.1; note, *Protection and Used Trade Secrets,* 64 Harv. L. Rev. 976, 982 (1951). The authorities differ, however, as to whether an injunction issued to protect a trade secret should terminate after the secrecy ends.

The sixth and seventh Federal Circuit Courts of Appeals hold that, once a person has obtained a disclosure through a breach of confidence while the disclosure was still secret, contrary to the obligations of a confidential or contractual relationship, he cannot thereafter use the subject matter of the disclosure which he has wrongfully used, even though members of the public can do so. *Shellmar Products v. Allen-Qualley Co.,* 87 F. 2d 104 (7th Cir. 1936) *cert. denied* 301 U. S. 695; *A. O. Smith Corp. v. Petroleum Iron Works Co.,* 73 F. 2d 531 (6th Cir. 1934). These cases deal with information subsequently patented but the rationale has been applied to trade secret cases, even where no patent is involved. The doctrine enunciated in this line of authorities is sometimes referred to as the *Shellmar* rule. The Second Circuit Court of Appeals and some other jurisdictions hold to the contrary. *Conmar Products Corp. v. Universal Slide Fastener Co., supra; Carter Products, Inc. v. Colgate-Palmolive Co., supra,* 130 F. Supp. at 575. The holding of these cases is sometimes referred to as the *Conmar* rule. The American cases which follow the *Shellmar* and *Conmar* rules respectively, are analyzed in Turner, *op.cit.,* at 442-454.

The reasoning of the *Conmar* rule is that the trade secret is protectible only because of the fiduciary relationship of the discloser to the disclosee. Once the secret is public, the confidence would end in any event. An injunction is issued only when damages are not adequate compensation and once a trade secret becomes public, its original owner can no longer be irreparably harmed by the use of the former secret by persons who origi-

nally used it wrongfully, because the rest of the world is also using it. Under this rule, a distinction is made between the use of an injunction to protect proper lawful interests and its use as a penalty.

The rationale of the *Shellmar* rule is that a person wronged has an action for breach of confidence entitling him to a perpetual injunction against the person who breached it of which the owner of the trade secret can not be deprived by an intervening publicity of the disclosure. The wrongdoer has deprived himself of the opportunity, open to the rest of the world, by his own violation of confidence.

Inherent in this judicial dichotomy is the weighing of the two conflicting social and economic philosophies, reference to which has been made in the discussion of the existence of a trade-secret—the balancing of the protection of rights in a proprietary knowledge gained by research and initiative against the interests in free competition and the use of an individual's skill for his own benefit and the benefit of the general public.

Our Court has had occasion to consider the balancing of these interests in a different aspect of the employer-employee relationship but one in which the decision is apposite to the considerations involved in the present case. In *Tawney v. Mutual System of Maryland,* 186 Md. 508, 47 A. 2d 372 (1946), the appellee, a small loan company, with another company, filed a bill for an injunction and accounting against two former employees and others, alleging that the employees had entered into employment contracts under which they agreed, *inter alia,* to keep secret the names of any past, present or prospective borrowers and customers of their employers; to refrain from using any information relative to such borrowers and customers, and to keep this information secret and refrain from using it for a period of three years from the date of termination of their employment. We held that these provisions of the contract of employment were valid and enforceable, but that other provisions requiring the employees to refrain from competition in the Baltimore City trading area for a period of two years from the date of termination were not enforceable. In holding the latter provisions illegal, Judge Henderson, for the Court, said:

"We think this goes beyond what is necessary to protect the good will of the employer, and works an undue hardship upon the employees, who would be excluded from engaging in the business for which they are specially fitted by long training and experience. Moreover the effect of enforcing the clause (M) would be to stifle competition, in a field where the existence of competition is clearly in the public interest." 186 Md. at 521.

Our holding in the *Tawney* case rested upon the invalidity of a portion of an express contract between employer and employee rather than upon a breach of an implied duty of loyalty which the employee owes the employer; however, in the portion of the opinion which has been quoted, we indicated our realization of the importance of protecting the legal interests of the employer to the extent necessary, without working an undue hardship upon the employee. The reference to the desirability of competition in a field where competition is clearly in the public interest is particularly relevant to the present case where the oxygen breathing hoses, which are the subject of litigation, are important to the national defense.

We agree with the *Conmar* rule. Our conclusion that this rule should be applied to the present case is fortified by the specific and important public interest here involved. The injunction should be modified so that it may be terminated if and when the methods and processes used by Darling in the manufacture of its oxygen breathing hoses become generally known to the public, without contribution in any way to such public knowledge through disclosures by the appellants.

We do not agree with the appellants that the injunction should be restricted to the use of the processes rather than prohibiting the manufacture of the product. Darling's trade secret consists too largely of the ordered relationship and combination of various steps and devices, some in themselves quite simple in nature, to make a prohibition of specific steps or processes practical. It is the period of the injunction, rather than its subject matter, which, under the circumstances, we find too broad.

There is, however, one aspect of the subject-matter of the

injunction which should be modified. We have found that the male disconnect attached to the hoses is not a part of Darling's trade secret and that the secret as to the manufacture of the hoses can be protected without inclusion of this attached fitting. The injunction should be restricted so as to exclude from its operation and effect the male disconnect under Military Specification H-22489.

Brandenburg and Norris contend that, in any event, they should not be enjoined from manufacturing any hose "like or similar" to Military Specification H-22489, because Brandenburg had the know how to build the hose, independently of any knowledge he acquired from the former employees. Even if Brandenburg knew how to build the hose, however, neither he, nor Norris, for whom he acted, had ever built such hose commercially. Brandenburg as an individual and Norris, as a company, actively helped Space Aero in producing the hose for which Space Aero obtained the Navy contracts. It is an implicit premise of the injunction that Darling's interests in its trade secret could not be adequately protected unless Brandenburg and Norris, as well as Space Aero and the former employees with whom they cooperated, were enjoined. There is a reasonable inference from the testimony that the practical knowledge which Brandenburg and Norris obtained from their association with the former employees in building the hose added to the knowledge which they formerly had. It would be difficult to separate the results of such practical experience from any independent knowledge formerly possessed. In view of all the circumstances, the court below was justified in enjoining Brandenburg and Norris, in order adequately to protect Darling. The harm to Darling and any hardship of the injunction upon Brandenburg and Norris sprang from the situation to whose making Brandenburg and Norris wrongfully contributed. See *Wicklein v. Kidd,* 149 Md. 412, 424, 131 Atl. 780 (1926) ; [6] and *Restatement, Torts,* § 941 comment b.

The appellants contend not only that the injunction is too

---

6. "[W]hen one of two persons must suffer loss by action of a third person, the loss should fall on him who has enabled the third person to occasion such loss" * * *.

broad, but that it is invalid, because the United States was not made a party to the proceedings. The injunction affects the United States in that Space Aero is enjoined from performing and bidding on contracts with the Navy, and therefore, the appellants argue, the decree cannot bind the government.

The answer to this contention is that the United States did not ask to be made a party to the proceedings, the appellee did not name it as a party defendant, and the appellants did not take any timely steps, in the court below, to have it joined as a necessary party. The statement of the United States as *amicus curiae* requested the lower court to consider its interest in the scope of the injunction to be entered, but the affidavit of Rear Admiral Hines attached thereto expressly disclaimed, on behalf of the Navy, the taking of any part in any dispute between the parties. The United States had ample notice of the pending litigation, and its failure to apply for joinder as a party is to be accepted as a disclaimer of any rights to that status. *Reddick v. State,* 213 Md. 18, 30, 130 A. 2d 762 (1957). The appellants did not raise the defense of want of a necessary party by way of motion under Maryland Rule 323 or by a dilatory plea under Rule 341.

The United States, however, by its statement as *amicus curiae* and the supporting affidavit filed on June 10, 1964, the date that the decree was signed, requested the court to consider the interest of the government in the scope of the injunction to be entered. The statement specifically requested that the injunction should exclude the performance of designated contracts between the Navy and Space Aero. The affidavit of Rear Admiral Hines, which was made a part of the statement, also referred to sub-contracts between Space Aero and certain Navy prime contractors. The affidavit stated:

"While there is reason to believe that delays in subcontract performance will curtail Navy scheduling, we are not immediately in a position to substantiate this view. It is respectfully requested that the Court grant leave to revise any injunction which may issue in the event affirmative data supports a demonstrable adverse interest to the National Defense."

On June 30, the court signed an order denying the petition

for modification of the injunction, without hearing, and, so far as the record discloses, without affording the United States an opportunity to show, as it had claimed, that the extent of the injunction would have a serious impact upon the Navy's military needs.

"Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go where only private interests are involved." *Virginia Ry. v. Federation,* 300 U. S. 515, 553 (1937). See also *Yakus v. United States,* 321 U. S. 414, 441 (1944). A court of equity can mold its decree to grant relief suitable to the peculiar nature of the case. *McKeever v. Realty Corp.,* 183 Md. 216, 224, 37 A. 2d 305 (1944).

The operation of the injunction issued below was stayed by the filing of a bond and it appears that the last completion date of the three contracts between the Navy and Space Aero specifically referred to in the statement of the United States Navy was in November, 1964. We do not know, however, whether these contracts have actually been completed. In the interest of the national defense, the government must be given the opportunity to show whether all the work required under these contracts has been performed; if not, the scope of the injunction should be limited to permit completion. The United States must also be accorded the opportunity, by appropriate proceedings in the lower court, to seek further to limit the scope of the injunction to permit the completion of Space Aero's subcontracts with the prime Navy contractees referred to in Rear Admiral Hines' affidavit, if it is determined that the prohibition of the completion of these subcontracts has a demonstrable adverse effect on the national defense. The damages, if any, sustained by Darling as the result of Space Aero's completion of its contracts can be determined in subsequent proceedings.

> *Order affirmed in part, reversed in part, and case remanded for the passage of an order and for further proceedings if necessary in conformity with this opinion; costs of this appeal to be paid one-half by the appellants in equal shares and one-half by the appellee.*

Per Curiam Opinion on Motion
for Modification

In the opinion filed herein on March 12, 1965, we considered the statement of the United States as *amicus curiae* and the supporting affidavit of Rear Admiral Hines requesting the court below to consider the interest of the government in the scope of the injunction to be entered. We held that, in the interest of the national defense, the United States must be given the opportunity to show whether all the work required under the contracts referred to has been performed and, if not, that the scope of the injunction should be limited to permit completion. We ordered the scope of the injunction modified in this respect, not only as to the contracts specifically referred to in the statement of the United States, but also as to the sub-contracts referred to in the affidavit of Rear Admiral Hines as to which the United States did not specifically request modification of the injunction. In their motion, the appellants now state that other departments and agencies of the United States have entered into contracts with Space Aero other than those referred to in the statement of the United States and the affidavit of Rear Admiral Hines. This allegation is supported by an affidavit of Rear Admiral E. R. Eastwold, assigned as Deputy Chief, Bureau of Naval Weapons, Department of the Navy. Rear Admiral Eastwold's affidavit states that, in addition to the contracts and sub-contracts to which reference has been made, the Navy has other prime contracts let to Space Aero and that the Navy's Aviation Supply Office has two uncompleted contracts with Airborne Research and Development Corporation, Sun Valley, California, which involved the same basic military specification and that this company has sub-contracted to Space Aero a significant segment of the work required by the contracts. The only other Navy-approved source for the oxygen air hoses, it is stated in the affidavit, is the Darling Company, the appellee. The affidavit states that in the event Space Aero is unable to complete the work on these additional contracts and sub-contracts, a substantial amount of additional time will be required to complete them, with a consequent disruptive effect upon the delivery of urgently required breathing hoses essential for pilots'

safety in the operation of the Navy's first line fighter and attack aircraft. Rear Admiral Eastwold asks that, in the interest of the national defense, the scope of exceptions to the order of injunction be further broadened pursuant to the attitude expressed in the opinion.

The appellants' motion admits that there was nothing in the record on appeal regarding the additional contracts and sub-contracts referred to in Rear Admiral Eastwold's affidavit. Apparently, some of these additional contracts or sub-contracts were awarded after the litigation had begun and even after the injunction of the lower court was issued but was stayed pursuant to orders of this Court and the posting of a supersedeas bond. Nevertheless, for the reasons set forth in the opinion, we deem it necessary, in the interest of the national defense, that the injunction be further modified to direct the lower court, upon remand, to accord the United States of America, and any of its departments and agencies, an opportunity to demonstrate any adverse effect upon the national interest of any prohibition of the completion of any contracts or sub-contracts entered into by Space Aero under the designated military specification to the date of this Court's opinion. The failure of the United States and of the Navy to bring these additional contracts or sub-contracts to the attention of the lower court, or to our attention, can not be allowed to affect the safety of our military personnel. As was stated in our opinion, the damages, if any, sustained by Darling as a result of Space Aero's completion of its contracts or its sub-contracts, if it is determined by the lower court that the prohibition of the completion thereof has a demonstrable adverse effect upon the national defense, can be determined in subsequent proceedings. If any such completion is so permitted, it is for the lower court to determine whether the amount of the supersedeas bond should be raised and whether any part of the purchase price to be paid by the United States of America and any of its departments and agencies should be ordered withheld pending the ascertainment of the damages, if any, to Darling by reason of the completion of the work.

We note the statement in Rear Admiral Eastwold's affidavit that steps have been taken to insure that no further work will

be given Space Aero of the kind which it is enjoined from performing.

In our opinion, we considered the scope of the injunction only as it affected the appellants. No request for modification of the injunction as it affected employees of Space Aero, other than the appellants, was made in the court below, or in the briefs or arguments on appeal. The distinction, however, is impliedly raised for the first time in the motion now before us. We deem it proper that the injunction should be further modified so as to make it clear that any employees or agents of Space Aero, or of any of the individual appellants, other than the appellants themselves, are not to be prohibited from using their skills and from working for any other company in the manufacture or sale of pressure hose assemblies, if such hose assemblies have a construction different from that used by Darling and if such manufacture or sale does not use Darling's trade secret methods and processes.

The other contentions raised in the appellants' motion have been considered by us in reaching the determinations set forth in the opinion and in respect thereto we adhere to the conclusions which we have set forth.

> *Motion for reargument denied; order affirmed in part and reversed in part and case remanded for further proceedings as provided in opinion filed herein on March 12, 1965, and as supplemented by this opinion.*