**ELLICOTT MACHINE CORPORATION**

v.

**WILEY MANUFACTURING COMPANY,**
**Frank J. Shebby and Nathaniel**
**E. Insley.**

**Civ. No. 17176.**

United States District Court
D. Maryland.

March 7, 1969.

Donald W. Farrington, Lynn L. Augspurger and McNenny, Farrington, Pearne & Gordon, Cleveland, Ohio, and William A. Grimes and Ober, Williams & Grimes, Baltimore, Md., for plaintiff.

David E. Varner, Edward M. Prince and Cushman, Darby & Cushman, Washington, D. C., and Benjamin C. Howard and Miles & Stockbridge, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

Plaintiff, Ellicott Machine Corporation (Ellicott), a Maryland corporation,

is the leading manufacturer of portable dredges, that is, dredges composed of several sections which can be shipped overland and assembled on the shore of the lake or other body of water where they are to work, and when the work is completed, disassembled, shipped to a new site and reassembled there. In November 1950 C. F. Kaufmann, plaintiff's chief engineer, applied for and in January 1956 was granted U. S. Patent No. 2,731,741 for a portable dredge with specified features which enable it to be assembled in the water, thus permitting the heavy pump and power unit to be installed in the center section at the factory. Kaufmann assigned Patent '741 to Ellicott.

Defendant Wiley Manufacturing Company (Wiley) is a Delaware corporation, having its principal place of business and shipyard at Port Deposit, Maryland, on the Susquehanna River, where it manufactures various types of vessels and hulls. In late 1964 and early 1965 it manufactured a portable dredge, the Betty M, for defendant Frank J. Shebby, a Maryland citizen, and assembled it on the banks of the Gunpowder River at Joppatowne, Maryland, where Shebby used it in performing a contract with the developers of Joppatowne.

In the early part of 1964, because of a strike at the Ellicott plant, Wiley had built for Ellicott the hulls and some other components for two dredges, and had completed the assembly of a third dredge, installing equipment manufactured by Ellicott. The contract for that work included an appropriate provision for the protection of any trade secrets of Ellicott's disclosed to Wiley.

In the last days of February 1964, while Wiley was performing that contract, defendant Insley, a salesman of portable dredges for Ellicott, left Ellicott's employ. Shortly thereafter he sought employment by Wiley and was engaged to make a market survey of the feasibility of Wiley's manufacturing and selling portable dredges in competition with Ellicott, AMMCO and Dixie, the

other principal manufacturers of portable dredges in the eastern United States. In the middle of May 1964, Insley was engaged by Wiley to head its new dredge division. In June 1964, Ted Jacks, who had been employed by Ellicott as a draftsman until he was laid off in January 1964, was employed by Wiley as an engineer. Jacks, with assistance from Insley and Wiley's engineering staff, prepared preliminary designs for a line of portable dredges, and prepared the working drawings for the Betty M, the portable dredge which Wiley manufactured for Shebby.

Count I of the complaint herein charges Wiley and Shebby with infringement of Patent '741.

Count II charges Wiley with unfair competition, misappropriation and use of Ellicott's trade secrets, and inducing Insley to disclose Ellicott's trade secrets to Wiley.

Count III charges Wiley with breach of its contract with Ellicott, by using in the manufacture of the Betty M and otherwise the trade secrets which Ellicott had disclosed to Wiley for the purposes of that contract.

Count IV charges Insley with unfair competition and wrongful disclosure to Wiley of Ellicott's trade secrets and other confidential information.

In November 1967 Ellicott filed an amended complaint charging Wiley in Count V with infringement of Ellicott's alleged common law trademark Sandpiper, and in Count VI with infringement of Ellicott's copyrights on two business forms. In November 1967, the Court granted Wiley's motion for summary judgment on Counts V and VI, without prejudice to Ellicott's offering evidence of copying of those business forms for whatever bearing such copying might have on the unfair competition and trade secret counts. The Court reserved ruling on Wiley's claim for an award of attorneys' fees for defending against those two counts.

Defendants denied all charges made by Ellicott,[1] and Wiley filed a counterclaim for damages, alleging that Ellicott brought this action in bad faith, without hope of recovery, and with the primary purpose of harassing and damaging Wiley.

### Jurisdiction

The Court has jurisdiction of the patent claim under 28 U.S.C. § 1338(a), and has jurisdiction of the claims asserted against Wiley in Count II under 28 U.S.C. § 1338(b), as amended June 25, 1948, which provides: "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws." [2]

■ The Court also has ancillary jurisdiction of Count III [3] and of the counterclaim.[4]

The Court does not have jurisdiction of the claim asserted in Count IV against Insley, since no claim under the patent laws was asserted against him.[5]

### The Trial

In November 1967 the Court and counsel examined at Crisfield, Maryland, the several sections and machinery of the Betty M, which had been repossessed by Wiley, disassembled and transported overland to Insley's new shipyard at Crisfield. During that examination Ellicott's counsel made his opening statement, and took a number of photographs. On the first day of the trial, April 29, 1968, the Court and counsel examined on a lake near Cedarville, New Jersey, the Big Bear, a portable dredge manufactured by Ellicott for Pennsylvania Glass Sand Company. During that examination Wiley's counsel made his opening statement and took a number of photographs. In addition to the photographs, many documents were offered in evidence, and both sides introduced factual and expert testimony.

Rulings on findings of fact proposed by the respective parties have been made and filed. This opinion will include only such facts as are necessary to understand the conclusions of law stated herein.

### I. The Patent Claim

Ellicott relies on Claims 1 and 2 of Patent '741, which read:

"1. A portable dredge having a hull comprising a main section and a pair of buoyant side sections, a pump and power unit centrally mounted in said main section, said main section being proportioned to provide a displacement exceeding the total weight of the main section plus the weight of the pump and power unit whereby the main section may be separably floatable in a stable up-right position, rigid fastening means connecting said side sections and said main section, said connecting means transmitting a portion of the weight of the main section to the side

1. Wiley's counsel also defended Shebby and Insley.

2. River Brand Rice Mills, Inc. v. General Foods Corp., 334 F.2d 770 (5 Cir. 1964), cert. den. 379 U.S. 998, 85 S.Ct. 716, 13 L.Ed.2d 700 (1965); Family Circle, Inc. v. Family Circle Associates, Inc., 332 F. 2d 534 (3 Cir. 1964); Rumbaugh v. Winifrede Railroad Co., 331 F.2d 530 (4 Cir. 1964); 1 Barron & Holtzoff, Federal Practice and Procedure, sec. 50 (Wright ed. 1960); Wright, Federal Courts, sec. 19 (1963).

3. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966); Miller Equipment Co. v. Colonial Steel and Iron Co., 383 F.2d 669, 674 (4 Cir. 1967); Carliner v. Fair Lanes, Inc., 244 F.Supp. 25 (D.Md.1965); Salganik v. Mayor & City Council of Baltimore, 192 F.Supp. 897 (D.Md.1961).

4. F.R.Civ.P. 13(a); Great Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d 631 (3 Cir. 1961); Dery v. Wyer, 265 F.2d 804 (2 Cir. 1959); 1A Barron & Holtzoff, supra, sec. 392; Wright, supra, sec. 79. Cf. Chance v. County Board of School Trustees of McHenry County, Illinois, 332 F.2d 971 (7 Cir. 1964).

5. See Rumbaugh v. Winifrede Railroad Co., supra; New Orleans Public Belt R. Co. v. Wallace, 173 F.2d 145 (5 Cir. 1949); Oliver J. Olson & Co. v. Marine Terminals Corp., 215 F.Supp. 490 (N.D. Cal.1962); Sullivan v. United States, 120 F.Supp. 217 (N.D.Ill.1954).

sections whereby said main section is supported by said side sections so that the assembled hull floats higher out of the water than the main section floating separately.

"2. A portable dredge having a hull, a pump and power unit in said hull, said hull comprising a main section and a pair of side sections, said main section being proportioned to provide a displacement exceeding the total weight of the main section plus the weight of said pump and power unit, said pump and power unit being mounted centrally of said main section, each of said side sections respectively comprising a pair of separable parts arranged end to end, the combined length of the parts exceeds the length of the main section, the main section and side sections being separably floatable and adapted to be joined together while being floated, rigid connecting means connecting said main section and side sections limiting the relative vertical movement of said main section and side sections whereby a portion of the weight of said main section is supported by said side sections when said hull is assembled."

A. Defendants contend that those claims are invalid (1) for lack of novelty,[6] and (2) for failure to meet the non-obvious requirement for patentability set forth in 35 U.S.C. § 103.[7]

B. Defendants further contend that Claims 1 and 2 of the patent in suit are not infringed by the accused dredge Betty M on the ground that it would be impossible to assemble the Betty M in the water in accordance with the teachings of the patent, and therefore that "the Betty M differs in structure, function and mode of operation from, and does not operate in the same way with the same means to secure the same result as, the teachings of the patent in suit".

### A. Validity

Ellicott concedes that portable dredges were not new in 1950; it also concedes that the several elements contained in Claims 1 and 2 are all old. Ellicott argues, however, that the combination of those elements produces a new and useful result—a portable dredge which can be assembled in the water—which is patentable under 35 U.S.C. § 101.[8]

For the reasons stated below, this Court agrees with that contention, if, but only if, the claims be narrowly construed to require that the teachings of the patent be followed strictly, so that the dredge can in fact as well as in theory be assembled in the water.

This conclusion is supported by the applicable legal principles, by the specifications in Patent '741, and by the file wrapper or prosecution history of that patent in the Patent Office.

The controlling principles are fully discussed in two recent and important decisions of the Supreme Court, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct.

6. More specifically, for failure to meet the condition for patentability set forth in 35 U.S.C. § 102(b), since defendants contend, in the language of that subsection: "the invention was patented or described in a printed publication in this * * * country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States". Defendants rely particularly on U.S. Patent No. 1,010,-568, issued to Barnhart in 1911, on a derrick barge, known as McDermott Derrick Barge No. 4, manufactured by Wiley in 1949, and on the dredge Colorado, manufactured by Pacific Coast Engineering Co. in 1949, all of which are discussed later in this opinion. See also notes 11, 12 and 13.

7. "§ 103. Conditions for patentability; non-obvious subject matter.
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

8. It has long been recognized as "a general rule, though perhaps not an invariable one, that if a new combination and

684, 15 L.Ed.2d 545 (1966), and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In the *Adams* case the Court said: "While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, * * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." 383 U.S. at 48, 49, 86 S.Ct. at 713.

In the *John Deere Co.* case the Court said: "It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office". 383 U.S. at 33, 86 S.Ct. at 702.

The specifications set out [9] show that the principal object of the invention was

---

arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention". Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177. A combination "is patentable if it produces new and useful results, although all its constituents were well known and in common use before it was made, provided the results are a product of the combination, and not a mere aggregate of several results, each the product of one of the combined elements". 40 Am.Jur. 543, Patents, sec. 19, quoted in City of Grafton, W. Va. v. Otis Elevator Co., 166 F.2d 816, 817 (4 Cir. 1948). See also Brock v. Brown, 138 F.Supp. 628, 632–633 (D.Md.1956), aff'd 240 F.2d 723 (4 Cir. 1957); Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.2d 910, 913 (4 Cir. 1930). Ellicott argues that the several elements "by their joint action produce a new and useful result in a more advantageous way requiring less arduous labor in assembly and permitting economies of manufacture and assembly not possible before the invention of the patent."

9. "This invention relates to portable dredging machines, and, more particularly to the hydraulic-type machine mounted on a hull arranged for assembly at the point of use.

"The operational characteristics of a hydraulic dredge are well known as well as the problem connected with the assembly of a large floating craft complete with dredge machinery, especially where the machine is to be used on land-locked bodies of water. The ordinary procedure for placing the dredging machine in operation is to transport the structure in small increments and performing the assembly at the launching site. This involves fabrication of parts of the machine under conditions which are not adapted for the purpose.

"An object of this invention is to provide a sectional hull structure which may be pre-fabricated at the point of manufacture and transported to the operational site with a majority of the equipment mounted in place.

"An object of the invention is to provide a sectional hull structure which has a central section proportioned to provide a displacement exceeding the total weight of the section, pump, and the power unit mounted therein, which will float when launched in the water, during the assembling of the remaining sections of the hull thereto.

"A further object of this invention is to provide a dredging machine which is sectionalized in such a manner that ordinary means of transportation such as railroads and trucks may be utilized to move the machine to the desired location.

"Another object of the invention is to provide dredging machine which has the operational equipment mounted on a body section of the hull which will float upon being launched without assistance from the remaining sections of the hull.

"Another important object is to provide a dredging machine having a central body section of the hull with the operational equipment mounted thereon and auxiliary hull sections which may be floated into place and joined to the body section to complete the hull and give the machine the necessary buoyancy and stability characteristics required by the operation of the dredging machinery.

" * * * The main body section 21 is of such size that it may be conveniently handled and transported by truck or railway car. * * *

"The side sections 24 and 26 are then launched and the ballast tanks 31 inside are filled with water to lower their deck lines to that of the center section 21. They may then be floated to their operable position adjoining the center section and assembled thereto with conventional fastening means. After the assembly is completed, the water may be pumped from the side sections 24 and 26 whereupon their buoyancy will be returned and they will assist in floating the machinery and the center section 21 at a higher level above the water. * * * "

"to provide a sectional hull structure which has a central section proportioned to provide a displacement exceeding the total weight of the section, pump and power unit mounted therein, which will float when launched in the water during the assembling of the remaining sections of the hull thereto". The method of assembly is set out in detail in the specifications.

Claims 1 and 2 of the patent as issued (designated as Claims 13 and 14 in the Patent Office proceedings) were rejected by the examiner, but allowed by the Board of Appeals.

The Board of Appeals said:

"Dredges used a single time in landlocked waters so that they cannot be floated to the point of use have, in the past, been transported to the point of use in sections, a temporary shipway set up, the dredge assembled and slid into the water. This is a costly and time consuming operation and it occurred to the appellant in the instant case that if each of the sections of the dredge were made separately floatable and stable, assembly could take place in the water. To effectuate this concept, and as pointed out in claim 13, he made the dredge portable by making its hull in a plurality of sections. The main section has the pump and power unit assembled therewith prior to transport. In order for this main section to be floatable, it is of sufficient displacement to float by itself with the motor and pump in place. In order to make it stable so as to float evenly, the pump and power unit are centrally mounted. Thus this central section can be transported to the job, placed in the water and it will float in a level and stable condition. The other hull sections can be separately floated and be positioned on each side of the main section and fastened into place. If the main section either tilted or was unfloatable, this could not be done."

Noting that the rejection by the examiner was "on Casey in view of either Abbey or Emerson",[10] the Board of Appeals said that whether or not the Casey central section is floatable,

" * * * it could not be used in the manner discussed above that permits the instant portable dredge to be assembled in the water. Casey contains no suggestion of this idea, the value of which is both clearly established in the record and is obvious from the consideration of the fact that by its use the building of temporary shipways for assembly of the dredge is avoided."

The Board also noted that neither Abbey nor Emerson contains any suggestion of how to make a portable sectional dredge capable of assembly in the water to which it is transported. The Board of Appeals concluded:

"The noted features are brought out in claim 13 by recitation of the separate buoyant sections, with the pump and power unit centrally located relative to the main section so that it can float in a stable upright position enabling the other sections to be fastened thereto when all are deposited to float in water. * * * The mere fact that elements of appellant's dredge may be found in various patents does not necessarily negative invention. In re Holt, 34 C.C.P.A. 1129; 1947 C.D. 463; 605 O.G. 367; 162 F.2d 472; 74 USPQ 155. Moreover, the concept of doing a thing, the result of which is new and useful and unexpected, must be considered along with the actual means for doing it in considering the presence or absence of invention and patentability. In re Bisley, 39 C.C.P.A. 982; 1952 C.D. 298; 665 O.G. 639; 197 F.2d 355; 94 USPQ 80. Appellant has recognized, attacked and successfully solved a problem by means not suggested or disclosed to one skilled in the art by the cited references, either

10. U.S. Patent No. 1,619,850 issued to Casey, Mar. 8, 1927; Great Britain Patent No. 586,640 issued to Abbey, Mar.

26, 1947; U.S. Patent No. 154,545 issued to Emerson, Sept. 1, 1874.

singly or in combination, and such means provide for new and advantageous results."

Neither the examiner nor the Board of Appeals cited either U. S. Patent No. 1,010,568 issued to Barnhart in 1911,[11] or the McDermott Derrick Barge No. 4, a large vessel, manufactured by Wiley in 1949 for use in off-shore drilling operations in the Gulf of Mexico,[12] or the dredge Colorado, manufactured by a Pacific Coast concern about one year before the filing of the application for Patent '741.[13] The Court finds and concludes that none of those structures deprived the Kaufmann invention of the requisite novelty, or show that the subject matter thereof would have been obvious at the time of the invention to a person having ordinary skill in the art of designing portable dredges. None of them discloses the principle of the Kaufmann invention embodied in Patent '741. No one had ever theretofore assembled a dredge in the water, in the manner disclosed by the Kaufmann patent, with the pump and power unit already installed in the center section.

Since 1950 Ellicott has made and sold many portable dredges embodying the teachings of the patent. Ellicott has assembled one or more 8-inch dredges in the water at the point of use in accordance with the teaching of the patent, but has usually found it more practicable to install the pump and power unit with a crane after the several sections have been joined together in the water or to assemble the several hull sections on land and thereafter launch them as a unitary hull.[14] There is, therefore, little successful commercial use to support the presumption of validity in this case.[15] Nevertheless, the Court finds that the presumption of validity has not been overcome, provided the claims are narrowly construed, to cover a portable dredge which can practicably be assembled in the water, in accordance with the teachings of the patent.

11. Barnhart discloses a dipper type dredge having a main hull section, which carries all the dredging equipment and two side hull sections or pontoons detachably connected to the main hull section by means of four triangularly shaped braces, secured along both sides of the main hull section for folding movement about vertical axes to swing inboard away from or outboard over the deck of said side pontoons so as to be attachable thereto. The object of the invention of the Barnhart patent is to provide means for easily and quickly detaching the side hull sections in order to provide a dredge which can be readily dismantled to permit the same to pass through locks of a canal.

12. The barge had a center section on which a 150-ton crane was mounted and two side sections, which were attached to the main hull in the water at the Wiley shipyard, where a great deal of heavy equipment was available to assist in the operation. The barge was made in three sections so that if the off-shore drilling prospects failed, the oil company could use the 50-ft. wide center section as a petroleum barge and could fasten the two side sections to each other to make a 40-ft. petroleum barge. It has not been proved that the two side sections could have been detached from and re-attached to the center section without great difficulty.

13. The middle central section of the dredge Colorado could have been floated with the dredge pump and engine therein, but would have been considerably down at the stern, so that a large crane would have been needed to lift the middle central section at the aft end and level it before the other sections could have been attached. The dredge Colorado was not and could not practicably have been assembled in the water with the dredge pump and engine already installed.

14. The latter method avoids the difficult process of bolting the sections together in the water. The choice depends upon the facilities available at the assembly site, and upon the depth of the water and likelihood of waves at the time of assembly. There is no evidence that any portable dredges made and sold by Ellicott larger than 8-inches have ever been assembled in the water in accordance with the teachings of the patent in suit.

15. The fact that the Board of Appeals did not consider the Barnhart patent, the McDermott barge and the dredge Colorado weakens the extent to which the presumption of validity is reinforced by the Board's decision. See Universal, Inc.

## B. Infringement

The drawings annexed to and made a part of Patent '741 show the main section and two side sections extending all the way to the stern of the vessel, as those sections do in the Big Bear and other Dragon Line portable dredges manufactured by Ellicott. The accused dredge, the Betty M, has a transverse aft section which runs the full width of the dredge aft of the main center section and side sections. The pump and power units are mounted along the center longitudinal line of the main section, but so far aft that the main section would not be "separably floatable in a stable upright position". Nor would the rear section be "separably floatable in a stable upright position". Joined together, the rear section and the main section would probably float in a stable upright position; but if they had been so joined at Wiley's shipyard the resulting unit would have been too wide to transport on public roads or by railroad; and it would not be practicable, if indeed possible, to join them together in the water.

Moreover, even if those two sections were launched after having been joined together on shore, and so joined could be considered the "main section" within the meaning of Patent '741, it would not be practicable, if indeed possible, by *any* means, and clearly impossible by the "connecting means" provided for connecting the sections of the Betty M, to join the side sections to the combined "main section" while they were all afloat. The Betty M was completely assembled on land at its initial operating site at Joppatowne, Maryland, and then pushed into the water by a bulldozer.

The differences in the design of the Betty M were not made in an effort to evade a charge of infringement, but for legitimate purposes, one of which was the better protection of the spuds. Those differences avoid infringement of Patent '741; it would be impossible to assemble the Betty M in accordance with the teachings of the patent.

The Betty M does not infringe either Claim 1 or Claim 2 of the patent in suit.

## II. Trade Secrets

Count II of the complaint charges Wiley with unfair competition, misappropriation and use of Ellicott's trade secrets, and inducing Insley to disclose Ellicott's trade secrets to Wiley. Count III charges Wiley with breach of its February 1964 contract with Ellicott (under which Wiley fabricated and assembled various components of three dredges for Ellicott) by using in the manufacture of the Betty M and otherwise the trade secrets which Ellicott had disclosed to Wiley for the purposes of that contract. The two claims will be considered together.

For some years before 1964 Wiley had manufactured various components of dredges for Ellicott, and the relations between the companies had been friendly. Without Ellicott's knowledge, in 1963 Wiley attempted to acquire Dixie's portable dredge business, in order to manufacture and sell portable dredges in competition with Ellicott and AMMCO. Wiley denied any interest in entering the portable dredge business when Ellicott approached Wiley early in 1964 and suggested that Wiley fabricate and assemble components of three dredges for Ellicott. The contract for that work, made in February 1964, contained the provision: " * * * it is understood that all drawings and any other data furnished you for use on the five purchase orders are for your sole use only in performance of these orders. It is further understood that the drawings and information contained thereon, and any other data, are not to be divulged to other parties or used any way not in the best interest of Ellicott Machine Corporation". Ellicott

v. Kay Manufacturing Corp., 195 F.Supp. 241, 246 (M.D.N.C.1961), aff'd 301 F. 2d 140 (4 Cir. 1962); Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550, 564 (4 Cir. 1950); Heyl & Patterson, Inc. v. McDowell Co., 317 F.2d 719, 722 (4 Cir. 1963).

furnished Wiley with 108 drawings for its use in performing that contract, and with some supervision and instructions.

Ellicott has always considered its engineering drawings as part of its trade secrets and has adopted strict rules to protect that interest. When drawings are furnished to persons other than Ellicott's employees, a proprietary data stamp is placed on each drawing. Despite precautions, an occasional drawing has gone out unstamped, but Ellicott has taken reasonable steps to protect its trade secrets. It stamped the drawings it supplied to Wiley under the contract. Wiley returned those drawings to Ellicott, but preserved some data it had obtained therefrom.

Insley left Ellicott's employ in late February 1964, sought a job elsewhere, but within a month sought a job as salesman for Wiley. No such job was available, but during the discussion it was suggested that Insley prepare a market survey of the portable dredge business, to aid Wiley in deciding whether to enter that field. Insley prepared such a survey, using in large part non-secret information he had acquired while working for Ellicott, but also using some of Ellicott's trade secrets, particularly with respect to prices and profits.

Upon receiving that report Wiley hired Insley in May 1964 to head its newly-formed dredge division. Insley and Jacks, an engineer who had been laid off by Ellicott in January 1964 and employed by Wiley in June 1964, prepared preliminary plans for a line of portable dredges. They used in part non-secret information and skills they had acquired while in Ellicott's employ, in part records and skills developed by Wiley over the years in building various types of vessels and components for dredges, but also in part a few of Ellicott's trade secrets, particularly with respect to the hydraulic system, which they knew or which were in

Wiley's files as a result of the February 1964 contract.

Insley also followed up at least two contacts with prospective customers he had made while working for Ellicott, one, the State of Ohio, and the other, the developers of Joppatowne. All facts considered, the Court finds nothing improper in Wiley's bidding for the Ohio contract, which was awarded to Ellicott as the low bidder, nor in the sale of a dredge by Wiley to Shebby, for use in the development of Joppatowne. That dredge was the Betty M, which was designed by Jacks with the assistance of Insley and other Wiley engineers, and completed in early 1965. The Betty M is similar in many respects to Ellicott's Dragon Line dredges, but has many different design features. The Court finds that in preparing the preliminary designs for Wiley's line of dredges, Jacks used the information contained on one or more of the drawings Ellicott had furnished Wiley in connection with the February 1964 contract, or used some secret information he had acquired while working for Ellicott, probably both, along with a great deal of non-secret information he and other Wiley employees properly possessed.[16]

Some of these features were changed when Jacks and other Wiley employees prepared the engineering drawings for the Betty M. Nevertheless, the use of Ellicott's secret information enabled Wiley to prepare the preliminary designs for its line of portable dredges and the engineering drawings for the Betty M more quickly than it could otherwise have done; it is doubtful whether Wiley could otherwise have had its plans ready in time to obtain the contract for the Betty M. Wiley could, however, have obtained all the information which it used in the preparation of the preliminary designs and final drawings by expending a considerable amount of time in the inspec-

16. It should be noted that defendants did not call Jacks as a witness. He had suffered a heart attack some time before the trial, but was working regularly for Wiley during the trial. The Court finds that he could have been called without serious danger to him.

tion of Ellicott dredges and by searching catalogues and brochures issued over a period of years by various suppliers.

The controlling legal principles are set out in Space Aero Products Co. v. R. E. Darling Co., 238 Md. 93, 208 A.2d 74 (1965), and Servo Corporation of America v. General Electric Company, 393 F.2d 551 (4 Cir. 1968). See also Mycalex Corporation of America v. Pemco Corporation, 159 F.2d 907 (4 Cir. 1947); Head Ski Company v. Kam Ski Company, 158 F.Supp. 919 (D.Md.1958); Carter Products, Inc. v. Colgate-Palmolive Co., 130 F.Supp. 557, 571–575 (D.Md.1955), aff'd 230 F.2d 855 (4 Cir. 1956); and Restatement, Torts, section 757, all of which were cited with approval in the *Space Aero* case. This Court finds no conflict between the legal principles adopted in *Space Aero* and in *Servo*. Insofar as the legal principles stated in *Servo* were not stated or adopted in *Space Aero,* this Court finds that the Court of Appeals of Maryland would adopt and follow those principles.

As Judge Oppenheimer pointed out in *Space Aero,* "knowledge of the particular process, method, or material which is most appropriate to achieve the desired result may itself be a trade secret". 238 Md. at 107, 208 A.2d at 80. But, "a substantial element of secrecy must exist before the owner of the method is entitled to judicial protection. Absolute secrecy is not essential but a substantial element of secrecy must exist so that there would be difficulty in others properly acquiring the information. (Citations omitted) A trade secret owner, however, does not abandon his secret by a limited public publication for a restricted purpose." 238 Md. at 109–110, 208 A.2d at 82. Ellicott had undoubtedly disclosed certain information with respect to its dredges

in its brochures and operational drawings furnished to its customers, but these publications did not disclose all of its engineering information, and did not make its secrets so obvious as to render meaningless the confidential relationship which existed between Ellicott and Wiley.

The Restatement suggests some factors to be considered in determining whether given information is one's trade secret.[17] This Court has considered those factors and has concluded that the disclosures made by Ellicott to Wiley in connection with their February 1964 contract did not negate the substantial element of secrecy necessary to the existence of a trade secret. On the other hand, the number of secrets so disclosed was much less than Ellicott contends. Nevertheless, in those instances where the extent of disclosure is arguable, and where the information had not been clearly placed in the public domain, Wiley should not be allowed to avoid the consequences of its breach of confidence "by piecing together in retrospect bits of information which had been disclosed in a variety of places and which as a combination were not clearly a matter of public knowledge". Servo Corporation of America v. General Electric Company, 393 F.2d 551 (4 Cir. 1968). Moreover, Wiley has not shown that it obtained and used only material in the public domain; it used some material obtained as a result of its contract with Ellicott.

 When we come to the knowledge of Insley and Jacks, the problem is somewhat different. Trade secrets may include lists of customers, as well as knowledge of the most appropriate means to achieve a particular result. But, as was pointed out in *Space Aero:*

> "The development of the law of trade secrets is a result of balancing

17. "These factors are: '(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' Restatement, Torts, § 757b." 238 Md. at 110, 208 A.2d at 82.

two conflicting elements essential to our society. There is a strong policy favoring free competition; an employee is entitled to use the skill and knowledge of his trade or profession which he has learned in the course of his employment, for the benefit of himself and the public, if he does not violate a contractual or fiduciary obligation in doing so. (Citations omitted) On the other hand, in order to promote the progress of science and the useful arts, the law provides certain protections to an originator. Among these protections are the patent and copyright statutes and the law of torts prohibiting unfair competition. The law protecting trade secrets is another protection.

"The basis of the law as to trade secrets, apart from breach of contract, is abuse of confidence or impropriety in the means of procurement." 238 Md. at 113, 208 A.2d at 84.

There follows a full discussion of the problem.

The Court finds that most of the information used by Insley and Jacks was information which they had properly acquired, but that some of the information they supplied to Wiley amounted to an abuse of confidence, within the meaning of the applicable cases.

As found above, the use of Ellicott's secret pricing information by Insley in preparing his preliminary report, and the use by Insley and Jacks of confidential information supplied by Ellicott to Wiley in connection with the February 1964 contract and confidential information acquired by them while working for Ellicott, enabled Wiley to prepare the preliminary designs for its line of portable dredges and the engineering drawings for the Betty M more quickly than it could otherwise have done.

With respect to the question of damages to which Ellicott may be entitled, it is significant that most of the confidential items which were used by Wiley could have been discovered by Jacks, Insley or other Wiley employees by examining carefully Ellicott dredges and a mass of brochures. For those components which could have been so discovered, but which were not so disclosed as to destroy the confidential relationship, Ellicott's damages would be the cost of the investigation or investigations necessary to discover those items.

Ellicott offered no evidence of the probable cost of such investigation or investigations, nor of any damages it suffered by Insley's wrongful disclosure to Wiley of Ellicott's secret pricing policy. An accounting for profits would avail Ellicott nothing, since Wiley made no profit from the sale of the Betty M.

### Counterclaim

Wiley contends in its counterclaim that Ellicott brought this action for the primary purpose of harassing and injuring Wiley, and that Ellicott frustrated all efforts to clarify, simplify and reduce the issues, and unduly and unnecessarily prolonged the trial.

█ A. The Court finds that Ellicott was justified in bringing the suit for patent infringement. If its claims were broadly construed, they would be infringed by the Betty M. This is not such an exceptional case as would warrant an award of attorneys' fees under 35 U.S.C.A. § 285 in connection with the patent claims.

█ B. The misappropriation of some trade secrets by Wiley justified a claim for such misappropriation and use. The action was not brought for the purpose of harassing and injuring Wiley.

From the beginning of this case there was some confusion and misunderstanding with respect to the number of trade secrets which Ellicott claimed had been misappropriated. Defendants' Interrogatory No. 1 read as follows: "Describe fully and with particularity in writing, each and every feature portrayed in the drawings furnished defendant Wiley by plaintiff which constitute a trade secret

of plaintiff allegedly misappropriated and used by defendant Wiley, as averred in paragraph 27 of the Complaint." Plaintiff complied literally, listing some 1,000 items or details, and stating that "in collation and in combination" they constituted such trade secrets. At another time, a list of fourteen drawings embodying the alleged trade secrets was furnished, and shortly before the trial, plaintiff filed a detailed statement of eighteen features or groups of features, plus one general combination claim and one reservation for items which might be discovered during the trial. Near the end of the trial Ellicott reduced this list to two items, both dealing with the hydraulic system.[18]

The Court finds that Ellicott overstated the number of trade secrets which had been misappropriated, as a result of which the trial was somewhat prolonged.

Ellicott's delay in specifying the claimed secrets upon which it finally relied was caused in part by the fact that Wiley did not supply to Ellicott until after the trial had started certain drawings (the 3804 group) which Ellicott had asked for earlier. The expense to Wiley was minimized by the decision at one of the pretrial conferences not to require Wiley to present its defense to all of the trade secret claims until a reasonable time after Ellicott closed its case. As it turned out, Wiley did not ask any such delay, and the Court finds that Wiley did not incur any substantial amount of fees and expenses by reason of Ellicott's delay in reducing the number of trade secrets involved. Wiley would have incurred almost all of those fees and expenses in preparing to defend the claims which Ellicott was justified in presenting at the beginning of the trial.

This is not such a case as would warrant an award of attorneys' fees to Wiley against Ellicott in connection with the trade secret claims. Local No. 149, International Union, etc. v. American Brake Shoe Company, etc., 298 F.2d 212 (4 Cir. 1962). See also Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Specialty Equipment & Machinery Corp. v. Zell Motor Car Co., 193 F.2d 515 (4 Cir. 1952); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4 Cir. 1951). There is no statute for trade secret cases similar to 35 U.S.C.A. § 285 cited above. An award of the fees and expenses to Wiley is barred: (1) by the Court's finding that Ellicott was justified in bringing the suit for misappropriation and use of trade secrets; and also (2) by the doctrine of unclean hands: (a) because of Insley's use of Ellicott's confidential price information in preparing his preliminary report to Wiley and the use of that report by Wiley, (b) because of the use by Insley and Jacks in the preparation of the plans for Wiley's line of dredges of some confidential information supplied by Ellicott to Wiley in connection with the February 1964 contract, and some of Ellicott's trade secrets which they knew were confidential, and (c) because of Wiley's misrepresentations to Ellicott while the February 1964 contract was being negotiated, as a result of which Wiley obtained access to more than one hundred important Ellicott drawings, with accompanying detailed ordering data.

C. The Court has heretofore found that there was no justification for the trademark and copyright counts contained in the amended complaint filed by Ellicott. When Wiley's motion for summary judgment with respect to those two counts was granted, the Court stated that it would reserve ruling on any possible allowance of fees and expenses to

---

18. No. 10, an arrangement wherein a hydraulic auxiliary pump is belt driven at 1200 rpm, the drive shaft is mounted in bearings of a certain manufacture and drives the pump through a flexible coupling of the gear type, and No. 11, a hydraulic system which uses closed loop circuits for the cutter and winch drive, axial piston variable volume pumps, Staffa Mark IV motors and two suction pumps for replenishment and service.

Wiley until the trial on the merits. Wiley has supplied a breakdown of the fees and expenses of its counsel, attributing part to the patent claim, part to the trade secret claim and part to the trademark and copyright claims. Of the total fees and expenses through June 1968, in the total amount of $86,709.79, Wiley contends that $10,117.70 was attributable to the defense of trademark and copyright claims. Despite the testimony to that effect, after considering the entire record, the Court cannot find that that is a fair allocation. It was apparent that those claims were without substance as soon as counsel for Wiley took the depositions of two Ellicott witnesses. They were disposed of at the hearing on the motion for summary judgment. The Court finds that if an allowance could properly be made, an allowance of $5,750.00 for fees and $929.70 for expenses would be proper.

The Court finds, however, that Wiley is barred from prosecuting its counterclaim for this amount by reason of its unclean hands, as set out at the end of paragraph B, above.[19]

The Court will enter judgment finding Claims 1 and 2 of the Patent valid, as narrowly construed in this opinion, but not infringed. On all other claims of Ellicott against Wiley, judgment will be entered in favor of the defendant Wiley. On the counterclaim, judgment will be entered in favor of Ellicott. The claim against Insley will be dismissed for want of jurisdiction. Counsel should agree upon an appropriate form of judgment.

19. Moreover, in weighing the equities, the Court recalls that Ellicott would have been entitled to collect damages from Wiley measured by the cost of the investigations necessary to discover the confidential information belonging to Ellicott which was used by Wiley, but which Wiley employees could have discovered by a careful examination of several El-

licott dredges and a mass of brochures. The value of the time and effort required to prove such damages would probably have exceeded their amount, but if Ellicott had proved any such damages, they would have been an offset to any claim of Wiley's in connection with the trademark and copyright issues.